STATE OF CONNECTICUT *v.* CONNECTICUT STATE EMPLOYEES ASSOCIATION, SEIU LOCAL 2001 (SC 17937)

Rogers, C. J., and Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued January 8—officially released June 10, 2008

*Thomas P. Clifford III*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *William J. McCullough*, assistant attorney general, for the appellant (plaintiff).

*Robert J. Krzys*, for the appellee (defendant).

*Opinion*

SCHALLER, J. The plaintiff, the state of Connecticut,[1] appeals[2] from the judgment of the trial court denying its application to vacate an arbitration award in which

---

[1] In this matter, the state acted through the department of correction and the office of labor relations of the office of policy and management. For the sake of clarity and consistency in this opinion, we refer to the plaintiff as the state.

[2] The state appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the arbitrator found in favor of the defendant, the Connecticut State Employees Association, SEIU Local 2001, and concluded that the state had violated a collective bargaining agreement when it unilaterally removed a correction officer from a voluntary transfer list. The state claims that the trial court improperly denied its motion to vacate the arbitration award because the award violates public policy and is in manifest disregard of the law. We affirm the judgment of the trial court.

The record reveals the following undisputed material facts and procedural history. At some time prior to January 1, 2005, Martin Reyes, a lieutenant employed by the department of correction (department), and stationed at the Brooklyn correctional institution, requested a transfer to the Corrigan-Radgwoski correctional institution (Corrigan). Soon thereafter, Danielle Locas, a correction officer stationed at Corrigan, learned of Reyes' request and became concerned about the prospects of working with him. Reyes and Locas previously had been involved in a romantic relationship, which had turned violent as a result of an incident that had occurred in December, 1994. After this incident, Locas had filed an application for a restraining order[3]

---

[3] In her application, Locas made the following statement to the court. "[In December, 1994, Reyes and I] had gotten into a verbal fight. [Reyes] got extremely angry and started pounding his finger into my chest, screaming 'Don't play around with me.' He started to break the swinging door in the den. I picked up the portable phone to call 911, while telling [Reyes] to get out of my house. [Reyes] grabbed the phone out of my hand and used it to break apart the door. When I tried to leave the room, he wouldn't let me go by him. On the [third] or [fourth] try, [Reyes] pushed me against the chair and tried to hit me with the phone. In trying to block the assault, [Reyes] hit me with his hand on my chin. He let me up and started to leave. I grabbed a pair of scissors. [Reyes] started pushing me again. He left the room heading toward the rec room. I followed [Reyes] with the scissors. Once in the rec room, [Reyes] turned around . . . . [He] started to poke me in the chest, grabbed my wrist with the scissors and bent my wrist. I dropped the scissors. [Reyes] pushed me on a table, punched me in the face, grabbed the front of my shirt and slammed me against the table, yelling 'you can't leave me, I'll never let you go, I'll kill you first.' [Reyes] got up and stated he was going home to get his gun and said 'I'm coming back' and left."

pursuant to General Statutes (Rev. to 1993) § 46b-15.[4] On December 28, 1994, the trial court concluded that Locas' statement demonstrated that probable cause existed as to whether Locas was "subjected to a continuous threat of present physical pain or physical injury . . . ." General Statutes (Rev. to 1993) § 46b-15 (a). The trial court issued an ex parte restraining order preventing Reyes from contacting or stalking Locas. Pursuant to the terms of the order, it lapsed after ninety days because no hearing was conducted on the merits of Locas' underlying allegations.

Upon learning of Reyes' transfer request, Locas contacted Antonio Ponvert III, an attorney, concerning Reyes' transfer request. On or about January 5, 2005, Ponvert wrote to Margaret Chapple, an assistant attorney general, to inform Chapple of Locas' concerns regarding Reyes' transfer request. In the letter, Ponvert briefly described the incident that had occurred between Reyes and Locas in December, 1994. Ponvert requested that Chapple consult with the commissioner of the department in order to take appropriate action to protect Locas and to ensure her safety. Ponvert also

---

[4] General Statutes (Rev. to 1993) § 46b-15 provides in relevant part: "(a) Any family or household member as defined in section 46b-38a who has been subjected to a continuous threat of present physical pain or physical injury by another family or household member may make an application to the superior court for relief under this section.

"(b) . . . Upon receipt of the application the court shall order that a hearing on the application be held not later than fourteen days from the date of the order. . . . Such order may include temporary child custody or visitation rights and such relief may include but is not limited to an order enjoining the respondent from (1) imposing any restraint upon the person or liberty of the applicant; (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking the applicant or (3) entering the family dwelling or the dwelling of the applicant. *If an applicant alleges an immediate and present physical danger to the applicant, the court may issue an ex parte order granting such relief as it deems appropriate.* . . .

"(d) No order of the court shall exceed ninety days, except that an order may be extended by the court upon motion of the applicant for such additional time as the court deems necessary. . . ."(Emphasis added.)

informed Chapple that Locas was a named plaintiff in a sexual harassment action that had been filed in federal court by female employees of the department. On or about January 12, 2005, Locas wrote to Daniel Callahan, the director of human resources at the department, and informed him that a human resources employee had requested a copy of the police report of the December, 1994 incident. Locas indicated that she no longer had a copy of the police report, so she had sent the application for the restraining order that she had filed with the court instead. She also stated that she feared that Reyes would attempt to retaliate against her if he was transferred to Corrigan.

On or about February 1, 2005, the state notified Reyes of its decision to remove him from the Corrigan transfer list. The state informed Reyes that it had based its decision to remove his name on his past interactions with Locas. The state also indicated, during the hearing before the trial court on its motion to vacate the arbitration award, that the pending sexual harassment action played a role in its decision to remove Reyes from the transfer list, even though the allegations in the action did not implicate Reyes. On or about March 31, 2005, a vacancy occurred at Corrigan, which the state filled by transferring an employee who was junior to Reyes and who was on the transfer list.

The voluntary transfer of correction officers is governed by a collective bargaining agreement (agreement) executed between the state and the defendant, pursuant to General Statutes § 5-276a. Article five[5] of the

---

[5] Article five of the agreement, entitled Management Rights, provides: "Section 1. Except as otherwise limited by an express provision of this [a]greement, the [s]tate reserves and retains, whether exercised or not, all the lawful and customary rights, powers and prerogatives of public management. Such rights include, but are not limited to, establishing standards of productivity and performance of its employees; determining the mission of an [a]gency and the methods and means necessary to fulfill that mission, including the contracting out of, or discontinuation of services, positions, or programs in whole or in part; the determination of the content

agreement provides that except where otherwise limited by an express provision of the agreement, the state retains traditional managerial rights with regard to transfer of employees. Article twenty of the agreement sets forth specific guidelines that govern shift and facility assignments. Specifically, article twenty, § 6[6] governs voluntary transfers of employees. In order to effectuate a voluntary transfer, an employee must first place his or her name on a transfer list that corresponds to the employee's desired institution. Once a position at the designated institution becomes vacant, the employee's request will be granted if the employee is

of job classifications; the appointment, promotion, assignment, direction and transfer of personnel; the suspension, demotion, discharge or any other appropriate action against its employees; the relief from duty of its employees because of lack of work or for other legitimate reasons; the establishment of reasonable work rules; and the taking of all necessary actions to carry out its mission in emergencies.

"Section 2. Those inherent management rights not restricted by a specific provision of this [a]greement are not in any way, directly or indirectly subject to the grievance procedure."

[6] Article twenty, § 6 of the agreement provides: "In the case of voluntary transfers and voluntary transfer requests, the following shall apply:

"An employee requesting transfer under this section must put his/her name on a departmental transfer list in accordance with the departmental procedures in order to be considered. Such list will be updated quarterly.

"As the correctional facilities develop vacancies, the senior employee in the same classification whose name appears on the transfer list for a particular facility will be transferred.

"An employee must have worked six (6) months as a permanent employee to be eligible to have his/her name placed on the transfer list.

"Employees are not eligible for transfer under this [a]rticle if they have been granted, rejected or constructively rejected a prior transfer within the previous six (6) month period.

"Employees may remove their names from the transfer list at any time prior to being notified of an opening at the facility of their choice. The employee must notify the employer within [twenty-four] hours upon receipt of an offer of transfer of his or her intention to accept or reject such offer. Failure to comply with this provision shall be considered a constructive rejection of the offer of transfer.

"Voluntary transfers shall only be carried out after application of the bidding procedures provided elsewhere in this agreement for vacant positions have concluded and the vacancy still remains."

the most senior employee on the transfer list. Article twenty, § 6 does not reference any other factor to be considered in granting a voluntary transfer, other than compliance with the transfer list requirement and seniority.

Pursuant to these and other operative provisions of the agreement, the defendant filed a grievance on behalf of Reyes. The parties submitted the following stipulated issues to the arbitrator: (1) "Did the . . . [d]epartment . . . violate [a]rticle [seventeen] and/or [a]rticle [twenty] of the [agreement] when it removed the name of . . . Reyes from the transfer list to [Corrigan] on or before February 1, 2005?"; and (2) "If not, what shall be the remedy consistent with the [agreement]?" On November 21, 2005, and January 18, 2006, the arbitrator conducted hearings on the stipulated issues.

On March 31, 2006, the arbitrator sustained the grievance and ordered Reyes' transfer to Corrigan. In the opinion and award, the arbitrator first concluded that a prima facie case had been made that the state violated Reyes' transfer rights and that the state was unable to satisfy its burden to demonstrate "why [it was] entitled to remove a senior employee from a facility transfer list and award a vacant position to a junior officer." The arbitrator then found the following facts and drew the following conclusions.

The arbitrator noted that after Reyes had requested the transfer to Corrigan, the state removed his name from the transfer list because it believed that Reyes sought the transfer to Corrigan as a means of retaliating against Locas for complaints that she had filed against him. The state feared that effectuating Reyes' transfer would create a hostile work environment for Locas. The arbitrator recounted Locas' testimony that she is still concerned about what Reyes might do to her, even though more than one decade had passed between the

December, 1994 incident and his transfer request. Locas also testified that Reyes had stalked her and had attempted to contact her by coming to her front door, in violation of the ex parte restraining order. The arbitrator also noted that Reyes' reasons for requesting the transfer were unknown. The arbitrator indicated that the state had argued that it had the authority, pursuant to article five of the agreement, to exercise its managerial rights and block Reyes' transfer request.

The arbitrator found that while Locas had obtained an ex parte restraining order against Reyes, no criminal charges had ever been filed against Reyes, the restraining order had lapsed through operation of law after ninety days, Locas had filed no complaints after Reyes allegedly had violated the terms of the restraining order, and Reyes never had been disciplined by the state as a result of the December, 1994 incident. Regarding the state's contention that it retained managerial authority to block Reyes' request, the arbitrator recounted the testimony of the defendant's president, Lieutenant Cathy Osten, who testified that article twenty contains no substantive limitations and that the state, in negotiations in the successor agreement, had proposed new language that would permit the state to refuse an officer the right to transfer if it could establish just cause disciplinary reasons for the denial. The arbitrator concluded: "[A]s noted in the [agreement], [a]rticle [five] contains the predicate qualifier, 'Except as otherwise limited by an express provision of this [a]greement, the [s]tate reserves and retains . . . .' The [agreement] limits the [state] in [its] ability to transfer personnel from one facility to another. There is an express provision in the contract that minimizes the management right prerogative. The employee has certain transfer rights which are protected by the language of [a]rticle [twenty] which cannot be abrogated by the [s]tate. While the actions taken by [the state] in remov-

ing Reyes from the transfer list may have been well intentioned and designed to protect the rights of . . . Locas, the [agreement] controls."

Regarding the state's argument that public policy justified its removal of Reyes from the transfer list, the arbitrator concluded that "[w]hile the [s]tate argues that the issue before the arbitrator must be whether . . . [the state] acted in a reasonable and rational [manner] by removing Reyes from the transfer list, in its assertion [it is] in error. The primary criterion that the undersigned, as he is a creature of the [agreement], must consider is the [agreement]. Moreover, in support of [its] position, the [s]tate argued 'public policy' as the justification for denying the Reyes transfer. While this argument was well reasoned, it was based on standards not yet codified by courts of competent jurisdiction [that] have oversight in such matters such as these. As of this writing the 'Public Policy' theory is in its formative stages and [is] not yet widely accepted as grounds for overriding clear contractual language."

The arbitrator concluded further that "[t]he [present] matter is one of first impression and involves a contractual interpretation within the fabric of conflicting employee rights. While [the state] is within [its] rights to examine each transfer application on a case-by-case basis, there is no record evidence of any workplace interactions between Reyes and Locas or proof that they were or are unable to work together. Additionally there is no record of any inappropriate post 1994 interactions between the two." In summary of his conclusion, the arbitrator stated: "[t]he [agreement] contains no limitations of the type argued by the [s]tate. Reyes met all of the contractual requirements for the reassignment and absent a compelling reason why the transfer of an otherwise qualified [l]ieutenant should be denied, the [s]tate violated the [agreement] by unilaterally removing . . . Reyes from the voluntary transfer list."

The arbitrator also concluded that any lack of explanation from Reyes regarding his reason for requesting a transfer did not impact his contractual rights. The arbitrator then sustained the defendant's grievance and ordered the state to transfer Reyes to Corrigan.

On April 27, 2006, the state filed an application with the trial court to vacate the arbitration award. In its December 22, 2006 memorandum of decision following a hearing on the matter,[7] the trial court recognized that "[t]here is a clear public policy against workplace violence and against an employer maintaining a hostile work environment. That policy was articulated by the chief executive constitutional officer of the state in an [e]xecutive [o]rder of the [g]overnor [Executive Order No. Sixteen, "Violence in the Workplace Prevention Policy" (August 4, 1999) (executive order)][8] and a state

---

[7] On September 22, 2006, prior to its December 22, 2006 decision, the trial court rendered judgment in favor of the state on its motion to vacate the arbitral award. The court rendered judgment without prejudice because it noted that the record showed no objection to the state's motion. On October 12, 2006, the defendant filed a motion for reconsideration of the trial court's judgment, as well as an objection to the state's motion to vacate and a memorandum of law in support of its objection. The trial court's December 22, 2006 decision followed.

[8] Executive Order No. Sixteen provides: "WHEREAS, the [s]tate of Connecticut recognizes that workplace violence is a growing problem that must be addressed; and

"WHEREAS, the [s]tate is committed to providing its employees a reasonably safe and healthy working environment, free from intimidation, harassment, threats, and/or violent acts; and

"WHEREAS, violence or the threat of violence by or against any employee of the [s]tate of Connecticut or member of the public in the workplace is unacceptable and will subject the perpetrator to serious disciplinary action up to and including discharge and criminal penalties.

"NOW, THEREFORE, I, John G. Rowland, [g]overnor of the [s]tate of Connecticut, acting by virtue of the authority vested in me by the [c]onstitution and by the statutes of this state, do hereby ORDER and DIRECT:

"1. That all state agency personnel, contractors, subcontractors, and vendors comply with the following *Violence in the Workplace Prevention Policy*:

"The [s]tate of Connecticut adopts a statewide zero tolerance policy for workplace violence.

"Therefore, except as may be required as a condition of employment:

• No employee shall bring into any state worksite any weapon or dangerous instrument as defined herein.

statute prohibiting as a discriminatory practice conduct amounting to sexual harassment. [General Statutes § 46a-60]."[9] The trial court concluded that the award implicated this policy, but did not violate it. The trial

- No employee shall use, attempt to use, or threaten to use any such weapon or dangerous instrument in a state worksite.
- No employee shall cause or threaten to cause death or physical injury to any individual in a state worksite.

"Weapon means any firearm, including a BB gun, whether loaded or unloaded, any knife (excluding a small pen or pocket knife), including a switchblade or other knife having an automatic spring release device, a stiletto, any police baton or nightstick or any martial arts weapon or electronic defense weapon.

"Dangerous instrument means any instrument, article, or substance that, under the circumstances, is capable of causing death or serious physical injury.

"Violation of the above reasonable work rules shall subject the employee to disciplinary action up to and including discharge.

"2. That each agency must prominently post this policy and that all managers and supervisors must clearly communicate this policy to all state employees.

"3. That all managers and supervisors are expected to enforce this policy fairly and uniformly.

"4. That any employee who feels subjected to or witnesses violent, threatening, harassing, or intimidating behavior in the workplace immediately report the incident or statement to their supervisor, manager, or human resources office.

"5. That any employee who believes that there is a serious threat to their safety or the safety of others that requires immediate attention notify proper law enforcement authorities and his or her manager or supervisor.

"6. That any manager or supervisor receiving such a report shall immediately contact their human resources office to evaluate, investigate and take appropriate action.

"7. That all parties must cooperate fully when questioned regarding violations of this policy.

"8. That all parties be advised that any weapon or dangerous instrument at the worksite will be confiscated and that there is no reasonable expectation of privacy with respect to such items in the workplace.

"9. That this order applies to all state employees in the executive branch.

"10. That each agency will monitor the effective implementation of this policy.

"11. That this order shall take effect immediately." (Emphasis original.)

[9] General Statutes § 46a-60 provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section . . .

"(8) For an employer, by the employer or the employer's agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent, to harass any employee, person seeking employment or

court based its decision on the following facts found by the arbitrator. The alleged acts of violence that gave rise to the restraining order occurred more than one decade prior to Reyes' transfer request and did not occur in the workplace. The trial court also concluded that Locas feared not violence but supervisory retaliation and accommodation of Locas' fears could be "addressed through less draconian management tools." The trial court stated that the arbitrator's findings of fact indicated that there was no evidence of workplace interaction between Locas and Reyes, no evidence of workplace violence suffered by Locas at the hands of Reyes, and no showing that the two correction officers could not work in the same facility. The trial court emphasized that the only evidence of violence had occurred in 1994, and had resulted in a restraining order that lasted ninety days and lapsed by operation of law. The trial court then summarized its conclusion by stating "[i]n the case at bar, there may be a policy [against violence in the workplace] but there is no connection to that policy of the facts. It is the burden of the [state] to clearly demonstrate that the award violates the policy. Here, the award does not even remotely implicate the ambit of the policy."

On January 10, 2007, the state filed a motion to reargue and/or for reconsideration of the December 22, 2006 judgment, and on April 2, 2007, the trial court issued an amended memorandum of decision in response to the state's motion. In its amended memorandum of decision, the trial court concluded that the state "has not shown that Reyes' transfer would necessarily result in Reyes having direct authority over Locas;

---

member on the basis of sex. 'Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when . . . (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment . . . ."

nor has it proved that Reyes' transfer would necessarily result in Reyes and Locas having any work-related contact. If Reyes was intent on harassing or harming Locas, he would not need to work in the same correctional facility to do so. Therefore, [the state] has not proved that [Reyes'] motive for requesting a transfer is to harm or harass Locas." This appeal followed.

The state claims that the arbitration award should be vacated because it violates a clearly defined and dominant public policy. In the alternative, the state claims that the award should be vacated pursuant to General Statutes § 52-418 (a) (4) because the arbitrator exceeded his powers in manifest disregard of the law.

We first set forth the applicable standard of review. When the parties "agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement." (Internal quotation marks omitted.) *State v. New England Health Care Employees Union*, 271 Conn. 127, 134, 855 A.2d 964 (2004); see also *American Universal Ins. Co. v. DelGreco*, 205 Conn. 178, 185, 530 A.2d 171 (1987). "When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission." (Internal quotation marks omitted.) *State v. New England Health Care Employees Union*, supra, 134; see also *New Haven v. AFSCME, Council 15, Local 530*, 208 Conn. 411, 415–16, 544 A.2d 186 (1988). "Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Furthermore, in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings." (Citation

omitted; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, supra, 134.

In this case, it is undisputed that the scope of the submission was unrestricted. Nevertheless, despite our general rule that deference is normally accorded to arbitral awards in cases where the scope of the submission is unrestricted, we have recognized three grounds for vacating an award. Courts will vacate an arbitral award when the award rules on the constitutionality of a statute;[10] see *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985); violates clear public policy; *Watertown Police Union Local 541* v. *Watertown*, 210 Conn. 333, 339, 555 A.2d 406 (1989); or contravenes one or more of the statutory proscriptions of § 52-418.[11] *Carroll* v. *Aetna Casualty & Surety Co.*, 189 Conn. 16, 22–23, 453 A.2d 1158 (1983). As we previously have noted, the state claims that the arbitration award violates either public policy or one or more of the statutory proscriptions of § 52-418 (a) (4). We will address in turn the state's claims, as well as the appropriate standards that govern these claims.

---

[10] It is undisputed that this exception does not apply to either of the state's claims on appeal.

[11] General Statutes § 52-418 provides in relevant part: "(a) Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or *(4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. . . ."* (Emphasis added.)

I

The state first claims that the arbitrator's award violates the clearly defined and dominant public policy against violence in the workplace. The state argues that a "[s]tate employer is mandated by [the executive order] and . . . § 46a-60 to ensure all employees in state government with a safe, secure workplace free from intimidation and harassment." The state argues further that it produced sufficient evidence to support its claim that the arbitration award violates this policy and, thus, that the trial court's denial of vacatur was improper. In addition to the public policy against violence in the workplace, which the state expressly argues is implicated by the arbitral award, the state's argument implicates a second public policy, particularly because of its reliance on § 46a-60, against sexual harassment.[12] We conclude that the public policies against workplace violence and sexual harassment are clearly defined and dominant, for the purposes of vacating an arbitrator's award. Nevertheless, because we also conclude that the arbitrator's award in this case does not violate either public policy, we affirm the judgment of the trial court.

When "a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429, 747 A.2d 1017 (2000). Because the plaintiff's claim has a legitimate, colorable basis, de novo review of the award is appropriate in this case.

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong

---

[12] This policy is implicated by the state's argument that transferring Reyes to Corrigan would create a hostile work environment for Locas.

public policy. . . . A challenge that an award is in con-
travention of public policy is premised on the fact that
the parties cannot expect an arbitration award approv-
ing conduct which is illegal or contrary to public policy
to receive judicial endorsement any more than parties
can expect a court to enforce such a contract between
them. . . . When a challenge to the arbitrator's author-
ity is made on public policy grounds, however, the court
is not concerned with the correctness of the arbitrator's
decision but with the lawfulness of enforcing the award.
. . . Accordingly, the public policy exception to arbitral
authority should be narrowly construed and [a] court's
refusal to enforce an arbitrator's interpretation of [col-
lective bargaining agreements] is limited to situations
where the contract as interpreted would violate some
explicit public policy that is well defined and dominant,
and is to be ascertained by reference to the laws and
legal precedents and not from general considerations of
supposed public interests." (Citations omitted; internal
quotation marks omitted.) *State* v. *New England Health
Care Employees Union*, supra, 271 Conn. 135–36.

A "two-step analysis . . . [is] often employed [in]
deciding cases such as this. First, the court determines
whether an explicit, well-defined and dominant public
policy can be identified. If so, the court then decides
if the arbitrator's award violated the public policy."
(Internal quotation marks omitted.) *State* v. *AFSCME,
Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 476,
747 A.2d 480 (2000). We note that "[t]he party challeng-
ing the award bears the burden of proving that illegality
or conflict with public policy is clearly demonstrated.
. . . Therefore, given the narrow scope of the public
policy limitation on arbitral authority, the plaintiff can
prevail . . . only if it demonstrates that the [arbitra-
tors'] award clearly violates an established public policy
mandate. . . . It bears emphasizing, moreover, that
implicit in the stringent and narrow confines of this

exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Citations omitted; internal quotation marks omitted.) *State v. New England Health Care Employees Union*, supra, 271 Conn. 136.

Addressing the first prong of this test, we note that we have never determined, in the context of vacating an arbitration award, that public policies against either violence in the workplace or sexual harassment are clearly defined and dominant in Connecticut law.[13] In cases in which we have decided whether a public policy exists for the purpose of vacating an arbitration award, we have looked to a variety of sources for clearly defined and dominant public policies. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 428. Indeed, we previously have concluded that criminal statutes; see *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 36–37, 48, 757 A.2d 501 (2000); noncriminal statutes; see *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 138; city charters; see *Waterbury Teachers Assn.* v. *Furlong*, 162 Conn. 390, 423, 294 A.2d 546 (1972); as well as the rules of professional conduct governing attorneys; see *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 435; are sources of clearly defined and

---

[13] We have stated, however, that there is a public policy against sex-based discrimination in other contexts. In *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 706–10, 802 A.2d 731 (2002), we recognized that there is a general public policy against sex-based discrimination, but we declined to extend this exception to the at-will employment doctrine because the prohibition of sex-based discrimination does not apply to employers who employ less than three employees.

We also note that the United States Court of Appeals for the Second Circuit has recognized that sexual harassment is a clearly defined and dominant public policy for the purpose of reviewing arbitral awards. See *Newsday, Inc.* v. *Long Island Typographical Union*, 915 F.2d 840, 841 (2d Cir. 1990).

dominant public policies.[14] "Rather than requiring that public policy be grounded on a particular type of source, however, in determining whether a party has satisfied its burden of demonstrating the existence of a well-defined public policy, we have instead focused our inquiry on whether the alleged public policy is in fact clearly discernible in the purported source." *MedVal-USA Health Programs, Inc.* v. *MemberWorks, Inc.*, 273 Conn. 634, 657–58, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005).

"Thus, our case law establishes that, although we have been willing to find a public policy grounded in a variety of sources, the party seeking to establish the public policy bears a heavy burden of showing the existence of such a well-defined and dominant public policy. Indeed, we have in the past found a clear statement of that policy in some objectively stated form, such as a statute, city charter or rule of professional conduct. Although we do not decide that a statement in such a form is always required as the predicate for the public policy exception, we nonetheless adhere to the principle that the public policy must be explicit, well defined and dominant . . . ." (Internal quotation marks omitted.) Id., 661.

---

[14] While in those cases in which we have vacated an arbitral award on public policy grounds, the public policy has most commonly been grounded in the General Statutes; *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, 273 Conn. 634, 657–58, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005); we note that in other cases, we have found that the statute relied on as a ground for the alleged public policy was too tenuously related to the subject matter to constitute a ground for a clearly defined and dominant public policy. See, e.g., *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 81–82, 91, 777 A.2d 169 (2001); *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, 255 Conn. 800, 816–19, 770 A.2d 14 (2001) (concluding that statutes and regulations granting town authority to set entry level requirements for police officers did not establish explicit public policy that town has control over termination for lack of fitness for duty of police officer).

In support of its position that the public policies against workplace violence and sexual harassment are clearly defined and dominant, the state asserts that the sources of these policies are the executive order[15] and § 46a-60. See footnotes 8 and 9 of this opinion. In particular, the executive order explicitly states that "[t]he [s]tate of Connecticut adopts a statewide zero tolerance policy for workplace violence." Moreover, two Connecticut statutes, General Statutes §§ 4a-2a and 4b-136 (c), specifically address aspects of workplace violence. Section 4a-2a[16] commands the commissioner of administrative services to provide a program to educate state employees about, among other things, workplace violence awareness, preparedness and prevention. Section 4b-136 (c)[17] requires all state agencies to report all incidents of workplace violence and the resolution of these incidents. The executive order, coupled with the two statutes, indicates that the public policy against workplace violence is clearly defined and dominant. Similarly, the clear and unambiguous language of § 46a-60 (a) (8) (C) explicitly indicates that the maintenance of

---

[15] Although we never have concluded that an executive order may serve as the source of a clearly defined and dominant public policy, we see no reason why an executive order may not serve as the source of a public policy, especially in light of our previous conclusions that a rule of professional conduct and a city charter are sources of public policy. Rather, our inquiry focuses on whether the policy is explicit, well-defined and dominant.

[16] General Statutes § 4a-2a provides: "For the fiscal year ending June 30, 1999, and each fiscal year thereafter, the Commissioner of Administrative Services, in consultation with the Commissioner of Mental Health and Addiction Services and the Commissioner of Public Safety, shall, within the limits of available appropriations, provide an appropriate program of *workplace stress and violence awareness, prevention and preparedness* for state employees." (Emphasis added.)

[17] General Statutes § 4b-136 (c) provides: "Each state agency and each department, board, commission, institution or other agency of the state listed in the exceptions to the term 'state agency' in section 4b-130 shall *report quarterly to the council on the frequency, character and resolution of workplace violence incidents* and all security-related expenditures." (Emphasis added.) The department is a state agency according to General Statutes § 4b-130 (5) (F).

a hostile work environment constitutes sexual harassment and is prohibited by the laws of this state. We conclude that the policies against workplace violence and sexual harassment are explicitly discernable from their respective sources, and, therefore, are clearly defined and dominant for the purposes of vacating an arbitral award.

The second prong of the inquiry focuses on whether the state has satisfied its burden to demonstrate that the arbitrator's award violated either a public policy against violence in the workplace or a public policy against sexual harassment. Our analysis of this issue is confined to the facts as found by the arbitrator. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* supra, 252 Conn. 432.

Turning to the arbitrator's award with respect to a policy against violence in the workplace, the arbitrator found that no criminal charges had been filed against Reyes as a result of Locas' application for a restraining order, no disciplinary action had been taken against Reyes by the department as a result of the issuance of the restraining order, and that the order had lapsed as a matter of law, after ninety days. Despite the allegations that Reyes had violated the terms of the restraining order, the arbitrator found that Locas had filed no complaints against Reyes. The arbitrator found no evidence of any workplace interactions between Reyes or Locas or any proof that they were or are unable to work together.[18] The arbitrator also found no record of any inappropriate post-1994 interaction between Reyes and Locas. Although we acknowledge that Locas' concerns

---

[18] The state argues that these particular findings were improper because after the December, 1994 incident, the state endeavored to keep Reyes and Locas separate. Nevertheless, we must adhere to our rules governing review of arbitration awards, namely, that we give deference to findings of fact made by the arbitrator. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* supra, 252 Conn. 432.

about Reyes may be legitimate, we agree with the trial court and conclude that the state did not meet its burden of demonstrating that the award violates a public policy against violence in the workplace because the sole incident of violence between the two is too attenuated in time from the transfer request.

Turning to the arbitrator's findings with respect to a public policy against sexual harassment, the arbitrator concluded that the state had not disciplined Reyes for his actions that led to the December, 1994 ex parte restraining order. As we previously have noted, there is no evidence of any negative workplace interaction between Reyes and Locas or proof that they were unable to work together. Indeed, the record indicates that Reyes qualified for transfer to any facility other than Corrigan. The sole reason for the denial of his transfer request to Corrigan was his history with Locas.[19] Although the state asserts that, in its opinion, the transfer of Reyes would create a hostile work environment, it cites to no evidence that Reyes previously committed any acts of sexual harassment at work. The state, therefore, cannot meet its burden of demonstrating that the award violates a public policy against sexual harassment.

## II

We now turn to the state's second claim on appeal, that the arbitrator exceeded his power in manifest disregard of the law. Specifically, the state argues that because the arbitrator was aware of and ignored the public policy promoting a safe and secure workplace, the arbitrator improperly concluded that the only crite-

---

[19] During arbitration, Callahan testified that Locas' participation in the sexual harassment action played a part in the state's decision to remove Reyes from the Corrigan transfer list, but that, even in the absence of the action, he would have removed Reyes from the transfer list. We note that Locas' participation in the action is not relevant to our determination of the merits of this appeal.

rion relevant to the disposition of the submission was the agreement. The state asserts that the provisions of the agreement—specifically the seniority provision found in article twenty—should have been balanced with the overriding public policy safeguards, grounded in the executive order and § 46a-60 (a) (8), attached to every state workplace and on behalf of every state worker.[20] We conclude that the state has not met its significant burden to demonstrate that the arbitrator exercised his power in manifest disregard of the law.

In *Garrity* v. *McCaskey*, 223 Conn. 1, 612 A.2d 742 (1992), we outlined the standard of review for claims that an arbitrator issued a decision in manifest disregard of the law. We stated that "an award that manifests an egregious or patently irrational application of the law is an award that should be set aside pursuant to § 52-418 (a) (4) because the arbitrator has exceeded [his] powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. We emphasize, however, that the manifest disregard of the law ground for vacating an arbitration award is narrow and should be reserved for circumstances of an arbitrator's extraordinary lack of fidelity to established legal principles." (Internal quotation marks omitted.) Id., 10.

---

[20] The state also claims that in order for the arbitrator's decision to be countenanced by law, § 46a-60 would have to be included in the supersedence section of the collective bargaining agreement because the language in article twenty, § 6 directly contradicts § 46a-60. We disagree. The voluntary transfer provisions set forth in article twenty, § 6 do not violate state law and are common in many collective bargaining agreements. This appeal does not center on whether § 46a-60 should have been included in the supersedence appendix; it centers on (1) whether the public policies against workplace violence and sexual harassment are clearly defined and dominant for the purposes of vacating an arbitral award and whether the award violates these policies; and (2) whether the arbitrator ignored these policies when rendering his decision and whether this ignorance constitutes manifest disregard of the law.

We apply a test "consist[ing] of the following three elements, all of which must be satisfied in order for a court to vacate an arbitration award on the ground that the arbitration panel .manifestly disregarded the law: (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is well defined, explicit, and clearly applicable." *Saturn Construction Co.* v. *Premier Roofing Co.*, 238 Conn. 293, 305, 680 A.2d 1274 (1996). "[W]e do not review an arbitrator's decision merely for errors of law . . . . Even if the arbitrators were to have misapplied the law . . . such a misconstruction of the law would not demonstrate the arbitrators' egregious or patently irrational rejection of clearly controlling legal principles." *Garrity* v. *McCaskey*, supra, 223 Conn. 11–12.

This standard of proof has rarely, if ever, been met in Connecticut. Indeed, we previously have stated: "[t]he exceptionally high burden for proving a claim of manifest disregard of the law under § 52-418 (a) (4) is demonstrated by the fact that, since the test was first outlined in *Garrity*, this court has yet to conclude that an arbitrator manifestly disregarded the law." *Economos* v. *Liljedahl Bros.*, *Inc.*, 279 Conn. 300, 307 n.8, 901 A.2d 1198 (2006).

We begin our analysis by noting that the arbitrator's ruling properly conformed to the submission.[21] The arbitrator was asked if article twenty had been violated by the state's actions, and he concluded, despite the language of article five, that it had. The arbitrator stated that although the state's argument that these public

---

[21] Neither party challenges whether the arbitrator's decision conforms to the submission.

policies justified the removal of Reyes from the transfer list was well reasoned, "it was based on standards not yet codified by courts of competent jurisdiction [that] have oversight in matters such as these. As of this writing the 'Public Policy' theory is in its formative stages and [is] not yet widely accepted as grounds for overriding clear contractual language."

It is unclear whether the arbitrator, in this conclusion, refers to the specific public policies against violence in the workplace and sexual harassment or if he refers to the general public policy exception. On the one hand, if the arbitrator was referring to the specific policies against workplace violence and sexual harassment, whether the arbitrator's conclusion constitutes manifest disregard of the law depends on whether these policies were clearly applicable and ignored. On the other hand, if the arbitrator was referring to the public policy theory in general, his conclusion is improper because, as we previously have concluded, violation of public policy is a clearly defined ground on which an unrestricted arbitral award may be vacated. In either case, our inquiry would remain the same, however, because we would have to determine whether the general public policy exception was clearly applicable and ignored. Under either reading of the arbitrator's decision, it is clear that the arbitrator did not ignore clearly applicable law. Rather, at best for the state, he misapplied our law governing the vacating of arbitral awards on public policy grounds. The arbitrator considered the state's public policy arguments and decided that the clear contractual language was not contravened by any public policy. We note that, even if the arbitrator's decision constitutes a misapplication of the relevant law, we "are not at liberty to set aside an [arbitrator's] award because of an arguable difference regarding the meaning or *applicability* of laws"; (emphasis added) *Garrity* v. *McCaskey*, supra, 223 Conn. 9; and such a miscon-

struction of the law does not demonstrate the arbitrator's "egregious or patently irrational rejection of clearly controlling legal principles." Id., 11–12. Accordingly, the trial court properly denied the state's motion to vacate the arbitration award.

The judgment is affirmed.

In this opinion the other justices concurred.