AFSCME, COUNCIL 4, LOCAL 1565 *v.* DEPARTMENT
OF CORRECTION ET AL.
(SC 18187)

Rogers, C. J., and Katz, Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

Argued September 23—officially released November 9, 2010

*Todd D. Fernow,* for the appellant (plaintiff).

*Thomas P. Clifford III,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Philip M. Schulz,* assistant attorney general, for the appellees (named defendant et al.).

*Anthony D. Collins* and *Nancy E. Martin* filed a brief for the American Immigration Lawyers Association as amicus curiae.

*Edward J. Gavin, Jon L. Schoenhorn* and *Elisa L. Villa* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

KATZ, J. The plaintiff, AFSCME, Council 4, Local 1565, appeals, upon our grant of certification, from the judgment of the Appellate Court affirming the trial court's judgment denying the plaintiff's application to vacate an arbitration award holding that the named defendant, the department of correction,[1] had just cause to discharge its employee, Eunice Smith. *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 107 Conn. App. 321, 322, 945 A.2d 494 (2008). The plaintiff contends that the Appellate Court improperly rejected its claims that, by relying on Smith's admission into a pretrial program for accelerated rehabilitation pursuant to General Statutes § 54-56e[2] as evidence of her alleged misconduct, the arbitrator had issued an award that: (1) exceeded the arbitrator's authority in violation of General Statutes § 52-418 (a) (4);[3] and (2) violated the

---

[1] Although the plaintiff also named the office of the attorney general and the board of mediation and arbitration of the department of labor as defendants, consistent with the opinion of the Appellate Court, we refer to the department of correction as the defendant. See *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 107 Conn. App. 321, 332 n.1, 945 A.2d 494 (2008).

[2] Section 54-56e provides a pretrial program for accelerated rehabilitation of persons accused of a crime, or motor vehicle violation for which a sentence to a term of imprisonment may be imposed, that is not of a serious nature. See footnote 7 of this opinion for the relevant text of § 54-56e.

[3] General Statutes § 52-418 (a) provides: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

clear public policy underlying accelerated rehabilitation. We conclude that the arbitrator's award violated a clear and significant public policy, which is that acceptance of accelerated rehabilitation is not evidence of guilt, that it cannot be used as evidence of guilt, and that, indeed, acceptance of accelerated rehabilitation has no probative value on the issue of guilt or innocence of the charged offense. Accordingly, we reverse the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following facts and procedural history, based on the "[s]tatement of the [c]ase" recited in the arbitrator's award. "On January 17, 2003, as the result of a police investigation into a complaint that Smith, a correction officer, had threatened to shoot a coworker for refusing to answer questions about a union related posting, Smith was arrested and charged with making threats, breach of the peace and inciting injury to a person. On January 19, 2003, the police conducted a search of Smith's residence in order to confiscate a weapon registered to her. Due to the officers' discovery of a partially smoked marijuana cigarette and a pill bottle under Smith's bed, Smith was charged with possession of marijuana and drug paraphernalia.

"On May 19, 2003, Smith told the captain conducting the defendant's [administrative] investigation that she had accepted accelerated rehabilitation for the charges against her. On August 27 and September 17, 2003, the defendant held predisciplinary hearings on the matter. Through its investigation, the defendant found that Smith had been arrested and charged with threatening, inciting injury to persons, breach of the peace and possession of marijuana and drug paraphernalia. On November 6, 2003, Smith was dismissed from state service for on and off duty misconduct which violated

administrative directive 2.17 of the parties' collective bargaining agreement [agreement].[4]

"The plaintiff timely filed a grievance on behalf of Smith. After its grievance was denied, the plaintiff proceeded to arbitration. The plaintiff and the defendant were, at all relevant times, parties to [the agreement] that provided for final and binding arbitration of disputes arising under the agreement. Attorney Susan E. Halperin of the state board of mediation and arbitration was appointed as the arbitrator. At the arbitration hearings, which were held on October 28, 2004, and January 28, 2005, the plaintiff submitted that Smith's dismissal was unjustified because the defendant had failed to substantiate the violence related claims of the complaining officer. The parties stipulated to the following . . . submission: 'Was the dismissal of [Smith] for just cause? If not, what shall the remedy be, consistent with the [parties' contractual just cause standard]?' " Id., 322–24.

Following the "[s]tatement of the [c]ase" and a synopsis of the positions taken by both sides, the arbitrator's award provided the following "[d]iscussion and [a]nalysis," in which she identified the factors that she had considered and the facts that she had found. "The [a]rbitrator reviewed and analyzed the record evidence in light of the contractual just cause standard to determine if the evidence supported the dismissal.

"The [a]rbitrator utilized, as guidance in her deliberations, those certain elements of just cause that can be restated as follows:

---

[4] Administrative directive 2.17 of the agreement provides in relevant part: "The following behavior shall be strictly prohibited:

"1. Any act that jeopardizes the security of the unit, health, safety, or welfare of the public, staff or inmates. . . .

"3. Unauthorized possession of non-department issued firearms or other weapon while on duty or state property. . . .

"11. Engag[ing] in unprofessional or illegal behavior, both on and off duty, that could in any manner reflect negatively on the [defendant]."

"1. Was the employee forewarned of the consequences of [her] misconduct?

"2. Was the [e]mployer's rule or order reasonably related to safe and efficient operations?

"3. Did the [e]mployer, before administering the discipline, investigate to discover whether the employee did in fact violate or disobey a rule or order?

"4. Was the [e]mployer's investigation conducted fairly and objectively?

"5. Did the investigation produce substantial evidence or proof that the employee was guilty as charged?

"6. Has the [e]mployer applied its rules, orders and penalties evenhandedly and without discrimination?

"7. Was the degree of discipline reasonably related to the seriousness of the employee's proven offense and the employee's past record? . . .

"The [a]rbitrator discussed her application of these guidelines with the [p]arties at the outset of the hearing in order that the [p]arties as part of the proceeding could address any issues with regard to their application.

"The [defendant] has the burden in disciplinary matters to prove that [Smith] was guilty of the wrongdoing for which [s]he was charged.

"In the instant matter, [Smith] was terminated for her alleged behavior as it related to both [her] employee conduct and for alleged off-duty criminal charges.

"I find that the alleged threats against the other officer did not necessarily occur as described by the officers' allegations. The [defendant] also concluded that it was not able to fully substantiate the claims. The truth is somewhere between [Smith's] explanation and that of the [other officers].

"I find that the evidence is clear that . . . something occurred between the two officers over the issue of the distribution of the [u]nion material concerning [Smith]. The fact remains that the telephone contact by [Smith] with the other officer resulted in a series of events that led to [Smith's] subsequent arrest and dismissal.

"Nonetheless, [Smith] was aware of the consequences related to her conduct and had full notice of the [defendant's] rules regarding such conduct. There is no question that the rules are related to the efficient operation of the [defendant] especially in light of its mandates and mission.

"*Although [Smith] claims that she accepted [accelerated rehabilitation] on [the] advice of her attorney, the fact that she asked the court for and was granted [a]ccelerated [r]ehabilitation indicates that she accepted responsibility for the charges and assumes culpability. I find that fact to be substantial evidence of her violations before this arbitration.*

"Based on the foregoing, I find that [Smith] was terminated for just cause, and the [defendant] met its burden of proof." (Citation omitted; emphasis added.) Accordingly, the arbitrator denied the grievance.

The record reveals the following additional procedural history. The plaintiff filed an application to vacate the arbitration award on the following grounds: "The [arbitrator] exceeded [her] powers or so imperfectly executed them such that a mutual, final and definite award upon the subject matter was not made. . . . The [arbitrator is] guilty of misconduct by which the rights of the [plaintiff] have been prejudiced. . . . The award is against public policy." In support of these claims, the plaintiff contended that the arbitrator was limited to the terms of the collective bargaining agreement to determine whether the defendant had had just cause to discharge Smith but, instead, improperly had relied

on Smith's acceptance of accelerated rehabilitation. Following a hearing, the trial court denied the plaintiff's application to vacate the award. In its memorandum of decision, the court determined that the scope of its review was limited because the submission was unrestricted. In light of this fact, the court stated: "This court cannot find that [the arbitrator's award] was an egregious misperformance of duty in violation of . . . § 52-418 (a) (3) or (4). The court cannot correct errors of fact or law, substituting its judgment for the arbitrator's where the submission was unrestricted."

The plaintiff appealed from the trial court's decision denying its application to vacate the award to the Appellate Court, contending that the award violated the public policy underlying the accelerated rehabilitation statute, § 54-56e, and exceeded the arbitrator's authority in violation of § 52-418 (a) (4). *AFSCME, Council 4, Local 1565* v. *Dept. of Correction,* supra, 107 Conn. App. 322. The Appellate Court concluded that there was no clear public policy prohibiting an arbitrator, in rendering an arbitration award, from taking into account or drawing an inference from a party's acceptance of accelerated rehabilitation. Id., 332. Additionally, the Appellate Court concluded that the plaintiff had failed to demonstrate that the award manifested an egregious or patently irrational application of the law, or that the arbitrator had exceeded her powers or so imperfectly executed them that a mutual, final and definite award on the subject matter submitted had not been made. Id., 329. In connection with the latter conclusion, the court noted: "[C]ontrary to the plaintiff's claim, the arbitrator clearly relied on findings other than Smith's acceptance of accelerated rehabilitation. The arbitrator explicitly referred to the fact that Smith's telephone contact with another officer led to her dismissal and that Smith 'was aware of the consequences related to her conduct and had full notice of the [defen-

dant's] rules regarding such conduct.' The arbitrator further stated: 'The fact remains that the telephone contact by [Smith] with the other officer resulted in a series of events that led to [Smith's] subsequent arrest and dismissal.' " Id. Accordingly, the Appellate Court affirmed the trial court's judgment denying the plaintiff's application to vacate the award. Id., 332. This certified appeal followed.[5]

The plaintiff claims that the arbitration award should be vacated because it violates a clearly defined and dominant public policy. Specifically, it contends that, by relying on Smith's application for and admission to the accelerated rehabilitation program, the arbitrator violated the public policy that acceptance of the program is not evidence of guilt, that it cannot be used as evidence of guilt, and, indeed, that it has no probative value on the issue of guilt or innocence of the charged offenses. The amici curiae further contend that a contrary conclusion would both undermine the purposes of accelerated rehabilitation and have adverse collateral consequences with respect to the use of that evidence in immigration proceedings.[6] In the alternative, the plaintiff claims that the award should be vacated pursuant to § 52-418 (a) (4) because the arbitrator exceeded her powers in manifest disregard of the law. The defendant responds that the plaintiff failed to demonstrate that the arbitrator violated any clear public policy by relying on Smith's acceptance of accelerated rehabilitation because the submission was unrestricted and there is no ban on the use of this criminal procedure in a

---

[5] We granted the plaintiff's petition for certification, limited to the following issue: "Did the Appellate Court properly affirm the arbitration award affirming the firing of [Smith] based upon her application for and acceptance of accelerated rehabilitation?" *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 288 Conn. 913, 954 A.2d 183 (2008).

[6] This court granted the applications of the American Immigration Lawyers Association and the Connecticut Criminal Defense Lawyers Association to file amicus curiae briefs.

consensual grievance proceeding. Additionally, the defendant maintains that there was an independent basis to support the award.

For the reasons that follow, we conclude that the Appellate Court improperly determined that public policy does not prohibit an arbitrator, in rendering an award, from taking acceptance of accelerated rehabilitation into account or prohibit her from drawing an inference from a party's acceptance of accelerated rehabilitation. We further conclude that this was the sole basis of the arbitrator's decision. In light of this conclusion, we need not address the collateral consequences argument raised by the amici curiae nor the plaintiff's claim that the award constituted a manifest disregard of the law pursuant to § 52-418 (a).

The trial court's determination that the submission was unrestricted is not contested. Therefore, the following principles guide our review. "Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . .

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review

the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved. . . . In other words, [u]nder an unrestricted submission, the arbitrators' decision is considered final and binding; thus the courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact." (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 80, 881 A.2d 139 (2005).

"The long-standing principles governing consensual arbitration are, however, subject to certain exceptions. Although we have traditionally afforded considerable deference to the decisions of arbitrators, we have also conducted a more searching review of arbitral awards in certain circumstances. In *Garrity* v. *McCaskey*, [223 Conn. 1, 6, 612 A.2d 742 (1992)], this court listed three recognized grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . or (3) the award contravenes one or more of the statutory proscriptions of § 52-418 (a). . . . The judicial recognition of these grounds for vacatur evinces a willingness, in limited circumstances, to employ a heightened standard of judicial review of arbitral conclusions, despite the traditional high level of deference afforded to arbitrators' decisions when made in accordance with their authority pursuant to an unrestricted submission." (Internal quotation marks omitted.) *HH East Parcel, LLC* v. *Handy & Harman, Inc.*, 287 Conn. 189, 197, 947 A.2d 916 (2008).

A court's refusal to enforce an arbitrator's award on the basis of a violation of public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. "A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an

arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." (Internal quotation marks omitted.) *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO,* 255 Conn. 800, 815, 770 A.2d 14 (2001). "When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . .

"A two-step analysis . . . [is] often employed [in] deciding cases such as this. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy. . . . We note that [t]he party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail . . . only if it demonstrates that the [arbitrators'] award clearly violates an established public policy mandate. . . . It bears emphasizing, moreover, that implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Citations omitted; internal

quotation marks omitted.) *State* v. *Connecticut State Employees Assn.*, *SEIU Local 2001*, 287 Conn. 258, 273–74, 947 A.2d 928 (2008).

The seminal case with respect to the nature of the judicial review given to a claim that an arbitration award violates public policy is *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 747 A.2d 1017 (2000). This court concluded that, when a party challenges a consensual arbitral award claiming that it violates public policy and that challenge has a legitimate, colorable basis, we will engage in de novo review of the award to determine whether the award in fact violates public policy. Id., 429. Our case law following *Schoonmaker* has emphasized, however, that a reviewing court still is bound by the arbitrator's factual findings in making such a determination. See *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 95, 777 A.2d 169 (2001) ("To the extent that the plaintiff claims that the award violated public policy because the arbitrator misapplied the [contract's] definition of salaried employee, we decline to undertake judicial review of the arbitrator's factual determinations in interpreting the terms of the contract. The arbitrator made a factual determination that commission [on human rights and opportunities] staff attorneys are hourly, rather than salaried employees."); *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 51–52, 757 A.2d 501 (2000) (Noting in the context of a public policy challenge: "Our legal system . . . ordinarily give[s] great deference . . . to both the factual and legal determinations of the arbitrators. . . . [Even in] a de novo determination by the court . . . we give deference to the arbitrator's factual determinations." [Citations omitted.]).

In determining whether an arbitral award violates a well-defined public policy, this court has looked to a variety of sources as embodiments of such policies:

criminal statutes; see *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 48; noncriminal statutes; see *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 138, 855 A.2d 964 (2004); city charters; see *Waterbury Teachers Assn.* v. *Furlong*, 162 Conn. 390, 423–25, 294 A.2d 546 (1972); as well as the rules of professional conduct governing attorneys. See *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 435. "Rather than requiring that public policy be grounded on a particular type of source, however, in determining whether a party has satisfied its burden of demonstrating the existence of a well-defined public policy, we have instead focused our inquiry on whether the alleged public policy is in fact clearly discernible in the purported source." *Med-ValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, 273 Conn. 634, 657–58, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005). We therefore consider whether a public policy against using an application for and admission to the accelerated rehabilitation program as evidence or an admission of misconduct is clearly discernible under the source claimed—§ 54-56e.

We begin with the text of § 54-56e,[7] which provides for a pretrial program for accelerated rehabilitation

[7] General Statutes (Rev. to 2003) § 54-56e provides: "(a) There shall be a pretrial program for accelerated rehabilitation of persons accused of a crime or crimes or a motor vehicle violation or violations for which a sentence to a term of imprisonment may be imposed, which crimes or violations are not of a serious nature.

"(b) The court may, in its discretion, invoke such program on motion of the defendant or on motion of a state's attorney or prosecuting attorney with respect to a defendant (1) who, the court believes, will probably not offend in the future, (2) who has no previous record of conviction of a crime or of a violation of section 14-196, subsection (c) of section 14-215, section 14-222a, subsection (a) of section 14-224 or section 14-227a, (3) who has not been adjudged a youthful offender within the preceding five years under the provisions of sections 54-76b to 54-76n, inclusive, and (4) who states under oath, in open court or before any person designated by the

when the accused: is charged with crimes or violations

clerk and duly authorized to administer oaths, under the penalties of perjury that the defendant has never had such program invoked in the defendant's behalf, provided the defendant shall agree thereto and provided notice has been given by the defendant, on a form approved by rule of court, to the victim or victims of such crime or motor vehicle violation, if any, by registered or certified mail and such victim or victims have an opportunity to be heard thereon. In determining whether to grant an application under this section with respect to a person who has been adjudged a youthful offender under the provisions of sections 54-76b to 54-76n, inclusive, more than five years prior to the date of such application, and notwithstanding the provisions of section 54-76*l*, the court shall have access to the youthful offender records of such person and may consider the nature and circumstances of the crime with which such person was charged as a youth. Any defendant who makes application for participation in such program shall pay to the court an application fee of thirty-five dollars.

"(c) This section shall not be applicable: (1) To any person charged with a class A felony, a class B felony, except a violation of section 53a-122 that does not involve the use, attempted use or threatened use of physical force against another person, or a violation of section 14-227a, subdivision (2) of subsection (a) of section 53-21, section 53a-56b, 53a-60d, 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b, (2) to any person charged with a crime or motor vehicle violation who, as a result of the commission of such crime or motor vehicle violation, causes the death of another person, (3) to any person accused of a family violence crime as defined in section 46b-38a who (A) is eligible for the pretrial family violence education program established under section 46b-38c, or (B) has previously had the pretrial family violence education program invoked in such person's behalf, (4) to any person charged with a violation of section 21a-267 or 21a-279 who (A) is eligible for the pretrial drug education program established under section 54-56i, or (B) has previously had the pretrial drug education program invoked in such person's behalf, or (5) unless good cause is shown, to any person charged with a class C felony.

"(d) Except as provided in subsection (e) of this section, any defendant who enters such program shall pay to the court a participation fee of one hundred dollars. Any defendant who enters such program shall agree to the tolling of any statute of limitations with respect to such crime and to a waiver of the right to a speedy trial. Any such defendant shall appear in court and shall, under such conditions as the court shall order, be released to the custody of the Court Support Services Division, except that, if a criminal docket for drug-dependent persons has been established pursuant to section 51-181b in the judicial district, such defendant may be transferred, under such conditions as the court shall order, to the court handling such docket for supervision by such court. If the defendant refuses to accept, or, having accepted, violates such conditions, the defendant's case shall be brought to trial. The period of such probation or supervision, or both, shall

that are not of a serious nature but are punishable

not exceed two years. The court may order that as a condition of such probation the defendant participate in the zero-tolerance drug supervision program established pursuant to section 53a-39d. If the defendant has reached the age of sixteen years but has not reached the age of eighteen years, the court may order that as a condition of such probation the defendant be referred for services to a youth service bureau established pursuant to section 17a-39, provided the court finds, through an assessment by a youth service bureau or its designee, that the defendant is in need of and likely to benefit from such services. When determining any conditions of probation to order for a person entering such program who was charged with a misdemeanor that did not involve the use, attempted use or threatened use of physical force against another person or a motor vehicle violation, the court shall consider ordering the person to perform community service in the community in which the offense or violation occurred. If the court determines that community service is appropriate, such community service may be implemented by a community court established in accordance with section 51-181c if the offense or violation occurred within the jurisdiction of a community court established by said section. If the defendant is charged with a violation of section 46a-58, 53-37a, 53a-181j, 53a-181k or 53a-181*l*, the court may order that as a condition of such probation the defendant participate in a hate crimes diversion program as provided in subsection (e) of this section.

"(e) If the court orders the defendant to participate in a hate crimes diversion program as a condition of probation, the defendant shall pay to the court a participation fee of four hundred twenty-five dollars. No person may be excluded from such program for inability to pay such fee, provided (1) such person files with the court an affidavit of indigency or inability to pay, (2) such indigency or inability to pay is confirmed by the Court Support Services Division, and (3) the court enters a finding thereof. The Judicial Department shall contract with service providers, develop standards and oversee appropriate hate crimes diversion programs to meet the requirements of this section. Any defendant whose employment or residence makes it unreasonable to attend a hate crimes diversion program in this state may attend a program in another state which has standards substantially similar to, or higher than, those of this state, subject to the approval of the court and payment of the application and program fees as provided in this section. The hate crimes diversion program shall consist of an educational program and supervised community service.

"(f) If a defendant released to the custody of the Court Support Services Division satisfactorily completes such defendant's period of probation, such defendant may apply for dismissal of the charges against such defendant and the court, on finding such satisfactory completion, shall dismiss such charges. If the defendant does not apply for dismissal of the charges against such defendant after satisfactorily completing such defendant's period of probation, the court, upon receipt of a report submitted by the Court Support

by a term of imprisonment; has no previous record of conviction of a crime or of certain motor vehicle offenses; has not been adjudged a youthful offender within the preceding five years; and states under oath that she never has invoked the use of such program. General Statutes § 54-56e (a) and (b). The trial court may, in its discretion, invoke such program upon application of the accused or the state's attorney, provided the court believes that the person probably will not offend in the future. General Statutes § 54-56e (b). Any defendant who enters such program: must pay to the court a participation fee of $100; agree to the tolling of any statute of limitations with respect to such crime and to a waiver of the right to a speedy trial; appear in court and, under such conditions as the court shall order, be placed on probation and released to the custody of the court support services division of the judicial branch. General Statutes § 54-56e (d). If the defendant satisfactorily completes the period of probation, the court, on finding such satisfactory completion, shall dismiss the charges. General Statutes § 54-56e (f). Upon dismissal, all records of the charges against the defendant shall be erased. General Statutes § 54-56e (f).

At first blush, it is readily apparent that adjudication of guilt or innocence is deferred upon a defendant's admission into the accelerated rehabilitation program. An accelerated rehabilitation applicant is never: con-

Services Division that the defendant satisfactorily completed such defendant's period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. If a defendant transferred to the court handling the criminal docket for drug-dependent persons satisfactorily completes such defendant's period of supervision, the court shall release the defendant to the custody of the Court Support Services Division under such conditions as the court shall order or shall dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a defendant who has completed such defendant's period of probation or supervision or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal."

fronted directly by the trial court with the evidence that the state claims to have against her; canvassed or questioned about what rights are being forfeited; asked to accept any responsibility for the alleged offense; or advised that an inference of guilt or acceptance of accelerated rehabilitation will disadvantage her in any way other than the express conditions imposed pursuant to § 54-56e. Upon successful completion of the program, the charges are dismissed and all records of the charges are erased. Indeed, "the effect of accelerated rehabilitation is to delay, and possibly to end, criminal prosecution . . . ." *State* v. *Parker*, 194 Conn. 650, 655, 485 A.2d 139 (1984). Should the applicant fail to fulfill successfully the obligations pursuant to § 54-56e, the criminal case is restored to the trial list, and, consistent with constitutional guarantees, the applicant enjoys the presumption of innocence until such time that the state, if it ever does, proves her guilty beyond a reasonable doubt. *State* v. *Fanning*, 98 Conn. App. 111, 118, 908 A.2d 573 (2006) ("[i]f that defendant fails to complete the program satisfactorily, the suspension of the criminal prosecution may be terminated and he or she faces a trial with all of its attendant constitutional guarantees"), cert. denied, 281 Conn. 904, 916 A.2d 46 (2007). It seems irrational to presume that the legislature provided a scheme whereby an applicant who exchanges her right to litigate the issue of guilt for admission into this program and successfully completes its conditions could fare worse with regard to the presumption of innocence than the applicant who is unsuccessful and proceeds to trial.

Nevertheless, we recognize that the legislature did not *expressly* declare that the application for and acceptance into the program may not be used as evidence of guilt. Accordingly, to the extent that this silence creates an ambiguity; see General Statutes § 1-2z; we turn to the genealogy and legislative history of § 54-56e

to determine whether the legislature intended to allow the accelerated rehabilitation applicant to be treated as presumptively guilty of the offense with which she has been charged.

Under the terms of the statute as originally enacted, the accelerated rehabilitation program provided first time criminal defendants with an opportunity to have their cases diverted from the regular criminal docket and dismissed entirely upon the successful completion of a period of pretrial probation, lasting for up to two years. See Public Acts 1973, No. 73-641.[8] As with the current version of the statute, access to the program was limited to relatively minor offenses (class A, B and C felonies were excluded). Unlike the current statute, however, under the original version, neither the court nor the defendant could invoke the program. That right was placed in the exclusive discretion of the state's attorney, who was authorized to divert cases only if "such attorney believes . . . [that the accused] will probably not offend *again* . . . ." (Emphasis added.) Public Act 73-641, § 1.[9] Thus, as originally drafted, the use of the "not offend again" language and the availability of the program left to the sole discretion of the state's attorney suggested a legislative presumption of guilt associated with those admitted to the program.

Soon thereafter, the legislature amended the accelerated rehabilitation statute, allowing either the defendant or the state's attorney to file a motion for admission

[8] The statute originally was codified at General Statutes § 54-76p, and, in 1981, the provision was transferred to § 54-56e. See General Statutes (Rev. to 1981) § 54-56e. For purposes of clarity, we refer to the changes to the statute by the Public Act number.

[9] Public Act 73-641, § 1, provides in relevant part: "There shall be a pretrial program for accelerated rehabilitation of persons accused of a crime, not of a serious nature. . . . Such program may be invoked by a state's attorney or prosecuting attorney in his discretion with respect to an accused who, such attorney believes, will probably not offend again and who has no previous record of conviction of crime . . . ."

to the program, but reserving to the trial court the sole discretion whether to grant it, if the court "believes . . . [that the accused] *will probably not offend again* and [the accused] has no previous record of conviction of crime . . . ." (Emphasis added.) Public Acts 1974, No. 74-38. When the bill proposing the amendment was discussed in debates in both the House of Representatives and the Senate, the focus of those discussions was on the need to give the discretion for granting the program to the court, rather than the state's attorney, particularly when defense counsel and the prosecution disagreed on whether the program should be available for a given defendant. Notably, there was no mention of the purpose underlying the "offend again" language or the means by which the trial court was expected to make a finding thereon. See 17 H.R. Proc., Pt. 2, 1974 Sess., pp. 626–28; 17 S. Proc., Pt. 2, 1974 Sess., pp. 501–506.

Over the next eight years, the legislature amended the accelerated rehabilitation statute several times, primarily to streamline the application process and to restrict eligibility.[10] By 1982, however, it had become apparent that the vestigial "offend again" language was causing considerable concern among trial court judges authorized to grant or to deny applications. The crux of the problem, as explained by Representative Richard D. Tulisano, the sponsor of the bill proposing to amend the statute, was that judges were reporting to him that

---

[10] The statute was amended five times during this period for the following reasons: (1) to require that notice to the victim be sent on an approved form by certified mail; Public Acts 1976, No. 76-53; (2) to require that the defendant state under oath that he previously had not invoked the program; Public Acts 1976, No. 76-179; (3) to presumptively exclude youths who previously had been adjudged youthful offenders; Public Acts 1979, No. 79-581, § 11; (4) to substitute the office of adult probation for the commission on adult probation as custodian of accelerated rehabilitation grantees; and (5) to exclude defendants accused of driving while under the influence in violation of General Statutes § 14-227a. Public Acts 1981, No. 81-446.

the "offend again" language suggested that they had some obligation to make a finding on the record that the applicant had indeed "offended" in the first instance. 25 H.R. Proc., Pt. 1, 1982 Sess., pp. 230–31. Representative Tulisano framed the judges' concern as follows: "There are bits of confusion in the [accelerated rehabilitation] situation. People do not necessarily admit to any guilt, when they take it, and though the original language says, there has to be a finding that you will not offend again, some judges, after the fact, feel they have to find that he or she had offended in the first place. That was never the intent of the legislature.

"The issues [were] really that no person would do anything in the future similar to what they were accused of, without any admission on anybody's part that a prior act occurred. This will clarify the procedure. It's obviously not a major bill, but it does make a lot of problems in the courts in the day to day operation." Id. In order to address these concerns and to remove any doubt regarding whether any notion of "guilt" attended the accelerated rehabilitation application process, the 1982 amendment deleted the "offend again" language and substituted the phrase "offend in the future . . . ." Public Acts 1982, No. 82-9. It is also noteworthy that within the same Public Act, the legislature augmented the benefit provision of the statute to guarantee not only a dismissal of charges for those who successfully had completed the accelerated rehabilitation program, but the erasure of any record relating to the charges as well, pursuant to General Statutes § 54-142a. As part of this latter benefit, applicants were assured that, once the records were erased, *they would lawfully be entitled to testify under oath that they had never even been arrested.* See General Statutes § 54-142a (e) (3) ("[a]ny person who shall have been the subject of such an erasure shall be deemed to have never been arrested within the meaning of the general statutes with respect

to the proceedings so erased and may so swear under oath").

Therefore, on the basis of the language of § 54-56e and its legislative history, it is clear that an eligible accused may avail herself of the obvious benefits of avoiding protracted and potentially damaging litigation without having to admit guilt and without any requisite finding of guilt. As a result, Smith's application for and admission to the accelerated rehabilitation program in the present case is substantively different than the situation presented in *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 35. In *Groton*, this court agreed with the plaintiff employer that had discharged an employee who had been convicted following a plea of nolo contendere, that the public policy against embezzlement "encompasses the policy that an employer should not be compelled to reinstate an employee who has been convicted of embezzling the employer's funds, irrespective of whether the conviction followed a trial, a guilty plea, or a nolo contendere plea."[11] Id., 48. In the present case, Smith was not con-

---

[11] We note that there is no public policy against the reemployment or continuation of employment of those who have committed criminal misconduct, and indeed we expressly have declined to hold that an arbitral award mandating the return to work of one who has acted criminally is a per se violation of public policy. See *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 477–78, 747 A.2d 480 (2000) ("[w]e do not hold that the violation of a criminal statute is a per se public policy violation sufficient to justify vacating an arbitrator's decision"). Rather we consider "the nature of the improper act, its severity and the kind of . . . work the employee performs." *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 803, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000); see, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 35 (employee convicted of larceny of employer's funds); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 468–69 (state employee arrested for admittedly making obscene, racist telephone call to state legislator on state telephone during working hours); *South Windsor* v. *South Windsor Police Union, Local 1486, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 650, 677 A.2d 464 (police officer deliberately revealed identity of confidential informant), cert. denied, 239 Conn. 926, 683 A.2d 22 (1996).

victed and remained cloaked with the presumption of innocence afforded any arrestee. See also *Hyatt* v. *Commonwealth*, 17 S.W.3d 121, 123 (Ky. App. 2000) (Noting that, under the state's pretrial diversion program statute: "If the defendant successfully completes the provisions of the pretrial diversion agreement, the charges against the defendant shall be listed as dismissed-diverted and shall not constitute a criminal conviction. . . . The defendant shall not be required to list this disposition on any application for employment, licensure, or otherwise unless required to do so by federal law. . . . Pretrial diversion records shall not be introduced as evidence in any court in a civil, criminal, or other matter without the consent of the defendant. It is clear that the legislature intends for a successful pretrial diversion to, in effect, wipe the slate clean as to those charges. The legislature does not intend for the successful participant to be stigmatized . . . ." [Internal quotation marks omitted.]); *Pizzillo* v. *Pizzillo*, 884 S.W.2d 749, 755 (Tenn. App. 1994) ("A valid reason exists for distinguishing between expunged pretrial diversion records and expunged judicial diversion records. Persons participating in judicial diversion programs have been found guilty of the offense for which they were charged. Accordingly, they no longer enjoy the presumption of innocence with regard to the charge. On the other hand, persons on pretrial diversion have never been found guilty. They retain their presumption of innocence because they have not been required to plead to or to stand trial on the charge.").

Despite this well settled law, the defendant contends that the motion to vacate the award properly was denied for the following reasons. First, the defendant contends that "there is no policy barring consideration of [accelerated rehabilitation] in labor arbitrations . . . [and] there is a clear policy of holding state correctional officers to exceptionally high standards of conduct . . . ."

The defendant's focus is misplaced. The present case is not about the defendant's rules and regulations that are meant to promote public safety or whether the arbitrator properly *could* base an award on clear violations of those rules. Clearly, she could. Rather, it is about the arbitrator's reliance on Smith's admission into the accelerated rehabilitation program, which the arbitrator found was "substantial evidence" of her misconduct. The legislature has provided that the acceptance of accelerated rehabilitation does not furnish *any* inference of guilt or acceptance of responsibility, and, thus, there is no need to identify the various settings in which this impermissible inference conceivably could, but properly may not, be drawn. The defendant alternatively contends that, even if the arbitrator improperly relied on Smith's admission into the accelerated rehabilitation program as evidence of good cause for her discharge, such a decision would be a misstatement or misapplication of the law that cannot provide a basis to vacate an award. We agree that mistakes of law by the arbitrator are not sufficient to vitiate the award; *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 80; but we reject the defendant's logic, which would eviscerate the independent ground for vacating an award that violates public policy and require proof sufficient to meet the statutory ground under § 52-418 (a) (4).[12] Similarly, we reject the defendant's reliance

[12] In *Garrity* v. *McCaskey*, supra, 223 Conn. 9, this court outlined the following burden of proof for claims that an arbitrator had issued a decision in manifest disregard of the law in violation of § 52-418 (a) (4): (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is well defined, explicit, and clearly applicable. This court has acknowledged that "[t]he exceptionally high burden for proving a claim of manifest disregard of the law under § 52-418 (a) (4) is demonstrated by the fact that, since the test was first outlined in *Garrity*, this court has yet to conclude that an arbitrator manifestly disregarded the law." (Internal quotation marks omitted.) *State* v. *Connecticut State Employees Assn., SEIU Local 2001*, supra, 287 Conn. 280.

on the fact that the submission was unrestricted as a basis to shield from review the arbitrator's dependence on Smith's accelerated rehabilitation application. As this court often has stated: "Even in the case of an unrestricted submission, we have . . . recognized three grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . [and] (3) the award contravenes one or more of the statutory proscriptions of § 52-418." (Internal quotation marks omitted.) *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 273 Conn. 86, 94, 868 A.2d 47 (2005).

Finally, the defendant maintains that there was an independent basis for the award. Thus, according to the defendant, even if the arbitrator improperly relied on Smith's admission into the accelerated rehabilitation program as evidence of her guilt of the underlying conduct, this inference was not the sole basis of her decision and, therefore, the Appellate Court properly affirmed the trial court's decision denying the plaintiff's motion to vacate the award. We disagree.[13]

It is clear from her decision that, although the arbitrator noted that Smith had been "terminated for her alleged behavior as it related to both [her] employee conduct and for alleged off-duty criminal charges," the question before the arbitrator was not whether Smith had been fired for "alleged" misconduct, but rather

---

[13] By urging this court to sustain the award by excising the improper portion, the defendant, in essence, is asking us to infer findings that the arbitrator did not make. Because we are engaged in a de novo determination, and because the arbitrator did improperly rely on Smith's acceptance into the accelerated rehabilitation program, we cannot simply read the record to support the award. See *Almeida* v. *Liberty Mutual Ins. Co.*, 234 Conn. 817, 825, 663 A.2d 382 (1995) ("in cases where the arbitrators do not explicitly state findings, which they are not required to do, a reviewing court must search the record to determine whether there is substantial evidence to support the award").

whether those allegations were true. When deciding that issue, it is clear that the arbitrator relied exclusively on Smith's acceptance of accelerated rehabilitation. It is apparent that the arbitrator did not fully credit the defendant's testimonial evidence and indeed expressed uncertainty about what actually had transpired in connection with the alleged threats and, consequently, did not rely on that testimony as a basis for her decision. The arbitrator stated in her opinion: "I find that the alleged threats against the other officer did not necessarily occur as described by the officers' allegations." She then added that she was not alone in being unable to discern the truth from the disputed testimony, observing that "[t]he [defendant] also concluded that it was not able to fully substantiate the claims. The truth is somewhere between [Smith's] explanation and that of the [other officers]."

The arbitrator then made the following statement that the defendant relies on as an independent finding supporting the award: "I find that the evidence is clear that . . . something occurred between the two officers over the issue of the distribution of the union material concerning [Smith]. The fact remains that the telephone contact by [Smith] with the other officer resulted in a series of events that led to [Smith's] subsequent arrest and dismissal. . . . [Smith] was aware of the consequences related to her conduct and had full notice of the [defendant's] rules regarding such conduct. There is no question that the rules are related to the efficient operation of the [defendant] especially in light of its mandates and mission." Smith never contested that she had placed a telephone call at work concerning the posting of union materials, but offered testimony from herself and another witness that no threats had been made. Therefore, the arbitrator's findings that "something occurred" and that, as a result of that telephone call, a complaint was made, an investigation ensued,

and Smith was arrested and ultimately fired, do not answer the question of whether Smith was fired for *actual* and not merely alleged misconduct. Finally, the finding that Smith had notice of the rules merely stands for just that—notice—and does not answer or add anything more to the critical issue of whether she actually had violated them.

Having done nothing more than frame the issue presented, relate the historical events that resulted in the allegations and express her own inability to resolve the critical issue of whether a threat had been made, the arbitrator turned to the uncontested matter of record as the means by which to resolve her deadlock, and indeed expressed it as *the* dispositive factor in her decision: "Although [Smith] claims that she accepted [accelerated rehabilitation] on the advice of her attorney, the fact that she asked the [c]ourt for and was granted [a]ccelerated [r]ehabilitation indicates that she accepted responsibility for the charges and assumes culpability. I find that fact to be substantial evidence of her violations before this arbitration. Based on the foregoing, I find that [Smith] was terminated for just cause, and the [defendant] met its burden of proof." Therefore, the arbitrator denied the grievance. Accordingly, it is clear to this court that the arbitrator, unable to credit the defendant's evidence in support of its claims that Smith had engaged in the alleged misconduct and uncertain about what actually had transpired, relied on Smith's accelerated rehabilitation application as the dispositive factor in her decision.

In conclusion, our "experience in discerning public policy, the context in which public policy challenges typically arise, and the tradition of undertaking what in practice amounts to de novo review whenever an arbitral award falls outside the conventional rule of deference, requires that this court's admittedly strong commitment to the arbitration process must yield, when

a legitimate public policy is involved, to the logic of allowing the reviewing court to ensure that the award comports with that policy." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 431. In other words, when, as here, the arbitrator has violated public policy in making the determination upon which the award is based, we will not afford our usual deferential standard of review to the remainder of the award in order to uphold the award.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court, and to direct that court to remand the case to the arbitrator for further proceedings pursuant to § 52-418 (b).[14]

In this opinion the other justices concurred.

---

[14] General Statutes § 52-418 (b) provides: "If an award is vacated and the time within which the award is required to be rendered has not expired, the court or judge may direct a rehearing by the arbitrators. Notwithstanding the time within which the award is required to be rendered, if an award issued pursuant to a grievance taken under a collective bargaining agreement is vacated the court or judge shall direct a rehearing unless either party affirmatively pleads and the court or judge determines that there is no issue in dispute."