CITY OF HARTFORD *v.* HARTFORD MUNICIPAL
EMPLOYEES ASSOCIATION
(AC 32951)

DiPentima, C. J., and Alvord and West, Js.

Argued January 17—officially released April 3, 2012

*Stephen F. McEleney*, for the appellant (defendant).

*Lori A. Mizerak*, assistant corporation counsel, for the appellee (plaintiff).

ALVORD, J. The defendant union, the Hartford Municipal Employees Association, appeals from the judgment of the trial court granting the application of the plaintiff, the city of Hartford, to vacate an arbitration award. On appeal, the defendant claims that the court improperly vacated the arbitral award on public policy grounds. We agree and, accordingly, reverse the judgment of the trial court.

The following facts and procedural history are relevant to the defendant's appeal. On October 27, 2005, Vilma Rivera-Saez began her employment with the plaintiff in the tax collector's office of the finance department. At all relevant times, Rivera-Saez was a supervisory employee. In the summer of 2008, the tax collector contacted the plaintiff's chief auditor, Patrick Campbell, and asked him to investigate a series of cash shortages in that office. During the course of the investigation, Campbell discovered a scheme whereby unrecorded checks were substituted for cash in four daily deposits that had been made in November, 2007. Cash had been taken from a cashier's box in the office and replaced with checks that had been received in the mail. Checks received in the mail were processed and documented separately from those payments made directly to the cashiers in the tax collector's office.

By way of background, if a taxpayer came to the office to make a payment by cash or check, he or she would be serviced by a cashier at one of the " 'windows' " or cash registers. The cashier would record the transaction in the municipal computer system (Munis system) and place the cash or check into a locked box. Each cashier had a locked box and was responsible, at the end of the day, for balancing the cash and checks received that day against a report generated by the Munis system. Each cashier prepared a " 'Daily Deposit

Reconciliation Record' " (reconciliation record) that listed the cash and checks received with a certification that the deposits in that cashier's box matched the deposits recorded in the Munis system. A printout of the Munis report was attached to the reconciliation record, and the cash and checks itemized in the reconciliation record were supposed to match the cash and checks as recorded in the Munis report.

Campbell discovered that the cash and checks itemized on the Munis report did not match the itemization on the reconciliation record on four separate occasions. Although the total amount of payments received was the same, the amount in cash and the amount in checks differed. Those were the times that checks received in the mail were substituted for cash in the cashier's box. A particular cashier, who was Rivera-Saez' subordinate, was responsible for the preparation of the reconciliation records when all of the discrepancies occurred. On three of the four occasions, Rivera-Saez assisted him with the preparation of his reconciliation records and even initialed some of the paperwork. Campbell additionally discovered that Rivera-Saez, on several occasions, instructed that cashier to leave his box unlocked during his lunch breaks so that she could service taxpayers at the window in his absence.

Following the investigation, the plaintiff terminated the employment of Rivera-Saez for "serious acts of misconduct and/or gross negligence and extreme breach of her responsibility as a supervisory employee." The defendant filed a grievance on her behalf challenging the termination. Pursuant to the collective bargaining agreement between the plaintiff and the defendant, the parties submitted the grievance to arbitration. The issues before the three member arbitration panel were as follows: (1) "Did the [c]ity of Hartford terminate Vilma Rivera-Saez for just cause?" and (2) "If not, what shall the remedy be?"

The arbitration panel conducted a two day hearing and issued its award on December 9, 2009. It concluded that the plaintiff had terminated the employment of Rivera-Saez without just cause and that she should be reinstated to her position without back pay and benefits. Additionally, the award provided that she should be trained in the finance department's current practices and procedures. One panel member disagreed and wrote a dissenting opinion in which he concluded that returning Rivera-Saez to her former position of supervisor in the tax collector's office was contrary to public policy.

In the majority opinion, the arbitration panel made the following factual findings: (1) Rivera-Saez failed to perform her supervisory duties correctly, (2) each cashier was accountable for his or her own cash drawer and should not have delegated that responsibility to a third party, even if that third party was the cashier's supervisor, (3) as a supervisor, Rivera-Saez was required to document the work performance of her subordinate cashier, but there was no evidence that she coached, counseled or documented his performance deficiencies, (4) although the plaintiff "implied" that Rivera-Saez had " 'stolen' " cash through an improper deposit scheme, "there was no evidence offered to show [Rivera-Saez] was, in fact, a thief, thus this implication was quickly put aside by the [p]anel,"[1] (5) if the plaintiff had proved that Rivera-Saez had stolen the cash, termination of employment would have been appropriate, (6) the only reason for termination left to be considered by the panel was the plaintiff's allegation that Rivera-Saez had been " 'grossly negligent' in the performance of her duties," (7) Rivera-Saez handled her subordinate cashier's accounts in a "fiscally irresponsible" manner, (8) when she directed her subordinate cashier to leave

[1] Rivera-Saez was not charged with theft or any other crime in connection with these incidents.

his cashier's box unlocked, he was no longer being provided with a safe and secure work environment, (9) the reason Rivera-Saez gave for failing to compare the reconciliation record with the Munis report was self-serving and suggested that she was unaware of her responsibilities as a supervisor, (10) Rivera-Saez was grossly negligent, (11) Rivera-Saez received the ultimate discipline of termination of employment, whereas the cashier responsible for balancing his deposits was "given a slap on the wrist," (12) Rivera-Saez had an unblemished disciplinary record prior to her termination, (13) the plaintiff's failure to have written departmental policies and procedures regarding moneys collected contributed to the poor work performance of Rivera-Saez, (14) the plaintiff "apparently condoned [her] work behaviors as it failed to discipline, coach or counsel [Rivera-Saez] about claimed unacceptable practices," (15) the overall operation of the department was lax and unsecure, (16) the plaintiff instituted new written policies soon after Rivera-Saez' employment was terminated and (17) the plaintiff had to "accept some blame" because "it failed to adequately supervise the supervisor." Accordingly, the panel concluded that the termination of Rivera-Saez' employment was too harsh a penalty, although it recognized that her conduct warranted some level of discipline. It therefore reduced the termination to an indefinite suspension without back pay and benefits, reinstated her to her supervisory position and directed the plaintiff to train her in the department's current practices and procedures.

The plaintiff applied to the trial court to vacate the arbitration award, claiming, inter alia, that the panel's award violated public policy. The defendant filed a cross application to confirm the arbitration award. Although a stipulation signed by the parties provided that either party could submit copies of the arbitration

exhibits and the transcript of the arbitration proceedings to the court, only the transcript was made a part of the court's record. Following a hearing, the court granted the plaintiff's application to vacate the award and denied the defendant's cross application to confirm the award in a memorandum of decision issued October 21, 2010. Quoting extensively from the opinion of the dissenting member of the panel, the court concluded: "Based on her clear role in the scheme to swap cash for checks, the [plaintiff] cannot reasonably be expected to trust [Rivera-Saez]. The [a]ward, which returns [Rivera-Saez] to her position of financial responsibility is against public policy." The defendant filed a motion for reargument pursuant to Practice Book § 11-11, which the court denied on November 22, 2010. This appeal followed.

The defendant claims that the court improperly vacated the arbitration award because the plaintiff failed to demonstrate the existence of any explicit, well-defined and dominant public policy that would be violated by an award reinstating Rivera-Saez to her previous position. We agree.

We begin with general principles governing our review of arbitration awards. "Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration[2] and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted,[3] the resulting

---

[2] Both parties represented that the arbitration in the present case was consensual.

[3] "A submission is unrestricted when . . . the parties' arbitration agreement contains no language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review." (Internal quotation marks omitted.) *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 273 Conn. 86, 89 n.3, 868 A.2d 47 (2005).

In its appellate brief, the defendant represented that the parties granted authority to the arbitration panel under an unrestricted submission. The plaintiff has not disputed that the submission was unrestricted.

award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . .

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved. . . . In other words, [u]nder an unrestricted submission, the arbitrators' decision is considered final and binding; thus the courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact. . . .

"The long-standing principles governing consensual arbitration are, however, subject to certain exceptions. Although we have traditionally afforded considerable deference to the decisions of arbitrators, we have also conducted a more searching review of arbitral awards in certain circumstances. In *Garrity* v. *McCaskey*, [223 Conn. 1, 6, 612 A.2d 742 (1992)], [our Supreme Court] listed three recognized grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . or (3) the award contravenes one or more of the statutory proscriptions of [General Statutes] § 52-418 (a). . . . The judicial recognition of these grounds for vacatur evinces a willingness, in limited circumstances, to employ a heightened standard of judicial review of arbitral conclusions, despite the traditional high level of deference afforded to arbitrators' decisions when made in accordance with their authority pursuant to an

unrestricted submission." (Citation omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 298 Conn. 824, 834–35, 6 A.3d 1142 (2010). Here, the defendant's claim implicates the second exception only, and, therefore, it will be the focus of our discussion.

"Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. [Our Supreme Court has concluded] that where a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429, 747 A.2d 1017 (2000).

"A court's refusal to enforce an arbitrator's award on the basis of a violation of public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . . Accordingly, the public

policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . .

"A two-step analysis . . . [is] often employed [in] deciding cases such as this. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy. . . . We note that [t]he party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail . . . only if it demonstrates that the [arbitrators'] award clearly violates an established public policy mandate. . . . It bears emphasizing, moreover, that implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Citation omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 1565* v. *Dept. of Correction,* supra, 298 Conn. 835–36.

Our courts "have looked to a variety of sources in determining whether an arbitral award violates a well-defined public policy, and have cited, as examples of possible sources, statutes, administrative decisions and case law. . . . In those cases in which we have vacated an arbitral award on public policy grounds, the public policy has most commonly been grounded in the General Statutes." (Citation omitted.) *MedVal USA Health Programs, Inc.* v. *MemberWorks, Inc.,* 273 Conn. 634,

657, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedVal USA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005).

In the present case, the plaintiff has provided several articulations of the public policy that it claims would be violated by reinstating Rivera-Saez to her supervisory position in the tax collector's office. In its appellate brief, the plaintiff described the public policy at issue in this case as follows: (1) "enforcing the award would constitute a violation of public policy in that [Rivera-Saez], who was found to be grossly negligent in her duties . . . which included handling [c]ity money and finances, held a position of financial trust and returning her to work would jeopardize the fiscal accountability of the [c]ity"; (2) "the public policy [is] that employers should be able to trust their employees, especially those who are in a position of financial responsibility, trust that they will be able to do their job, and trust that the public who are required to deal with such employees feel that they are being served in an honest and trustworthy manner"; (3) "it would be a violation of public policy to send [Rivera-Saez], a grossly negligent employee with a total disregard of any accountability on her part, back to work in a department [that] regularly deals with finances and [that] requires employees in their job responsibilities and tasks to exercise fiscal responsibility"; (4) "it would be a violation of public policy to bring back to work a grossly negligent employee, such as [Rivera-Saez], in the position of [a]dministrative [a]ssistant, which is a position of financial responsibility and public trust"; (5) " 'public trust is a strong public policy' "; (6) "courts have also consistently found public policy violations where the employee engages in some apparent and egregious misconduct"; and (7) "it was not just that [Rivera-Saez] was grossly negligent, but that she was grossly negligent in an office whose main role is to handle and collect

taxpayer money and appropriately credit taxpayers' accounts, and is in a position of public trust that required her to be fiscally responsible." During oral argument, the plaintiff stressed that Rivera-Saez could not be trusted to do her job and that the taxpayers' moneys constituted a "public fund."[4]

The trial court, in determining that the award reinstating Rivera-Saez to her former position would violate public policy, concluded that Rivera-Saez "had played a pivotal role in the theft of public funds," that she "had a starring role in the scheme to steal from the [plaintiff] by swapping out cash for unrecorded checks," and that "[b]ased on her clear role in the scheme to swap cash for checks, the [plaintiff] cannot reasonably be expected to trust [Rivera-Saez]." In reaching its conclusion, the court stated that it was "not bound by the finding by the majority of the panel that there was no evidence presented to show that [Rivera-Saez] was a thief." (Internal quotation marks omitted.)

The plaintiff has not identified a definitive source for the public policy that it claims was violated by the arbitral award. There is no reference to a statute, either criminal or noncriminal, an administrative decision or relevant case law[5] that provides the basis for an explicit, well-defined and dominant public policy. Its position that grossly negligent[6] employees in positions of fiscal

---

[4] The plaintiff conceded in its appellate brief that "there is no specific statute [that] identifies this important public policy . . . ."

[5] The plaintiff cites *George* v. *Watertown*, 85 Conn. App. 606, 611, 858 A.2d 800, cert. denied, 272 Conn. 911, 863 A.2d 702 (2004), for its position that the public trust is a strong public policy. That case involved a collateral attack on a previously unchallenged condition attached to the approval of a subdivision application by a zoning authority. Its applicability to the present case is not apparent.

[6] Although the plaintiff emphasizes that the panel found Rivera-Saez to be grossly negligent in the performance of her duties, as opposed to being merely negligent, a finding of gross negligence does not automatically warrant the vacating of an award reinstating a grievant to a former position. Even criminal misconduct does not automatically warrant such a result. As determined by our Supreme Court, "there is no public policy against the

responsibility handling public funds cannot be reinstated without violating public policy sounds more like "general considerations of supposed public interests"; (internal quotation marks omitted) *AFSCME, Council 4, Local 1565* v. *Dept. of Correction,* supra, 298 Conn. 836; which our case law expressly has found to be insufficient for vacating an arbitral award.

Even if we assume arguendo that the plaintiff has successfully demonstrated that a well-defined public policy was implicated, we would nevertheless conclude that the plaintiff failed to demonstrate how the arbitration award reinstating Rivera-Saez to her position as supervisor would clearly violate that public policy. In reaching that determination, we rely on the facts as found by the arbitration panel. Contrary to the statement of the trial court in its memorandum of decision, "courts are bound by the arbitrator's factual findings when reviewing a claim that an award violates public policy . . . ." *HH East Parcel, LLC* v. *Handy & Harman, Inc.,* 287 Conn. 189, 204, 947 A.2d 916 (2008). "The legal determination of whether a particular award violates public policy *necessarily depends on the facts found by the arbitrator* during those proceedings." (Emphasis in original; internal quotation marks omitted.) Id., 201.

Accordingly, the trial court was obligated to consider the following factual findings made by the arbitrators when it decided whether the arbitral award violated public policy. There was no evidence submitted to show that Rivera-Saez was a "thief," and she had an unblemished disciplinary record prior to her termination.

---

reemployment or continuation of employment of those who have committed criminal misconduct, and indeed we expressly have declined to hold that an arbitral award mandating the return to work of one who has acted criminally is a per se violation of public policy." *AFSCME, Council 4, Local 1565* v. *Dept. of Correction,* supra, 298 Conn. 846 n.11.

Although her employment was terminated for her failure to supervise her subordinate properly, the cashier responsible for balancing all four erroneous deposits was merely "given a slap on the wrist." At the time of the incidents, the plaintiff had no written departmental policies and procedures pertaining to the collection of tax payments by the cashiers, which contributed to the failure of Rivera-Saez to execute her supervisory duties appropriately. Soon after she was terminated from her employment, the plaintiff instituted new written policies for the department. Because the overall operation of the department was lax and unsecure during her employment, the plaintiff was partially responsible for the situation.

The trial court, rather than focusing on those factual findings, relied on the dissenting member's conclusions. Quoting from the dissenting opinion, the court determined that Rivera-Saez "played a pivotal role in the theft of public funds" and had "a starring role in the scheme to steal from [the plaintiff] by swapping out cash for unrecorded checks . . . ." The court agreed with the dissenting member and improperly substituted its factual findings for those of the arbitrators.

Having considered the arbitrators' factual findings in our de novo review of the award to determine whether it violates public policy, we cannot conclude that reinstating Rivera-Saez to her former position, without back pay and benefits, would violate public policy. Even though the arbitrators found her grossly negligent, they also found that the plaintiff's lack of written policies and procedures had contributed to the problem and, furthermore, that the plaintiff had only mildly disciplined the cashier ultimately responsible for the reconciliation records on those occasions when the substitution of unrecorded checks for cash occurred. Moreover, as part of the award, the arbitrators provided that Rivera-Saez was to be trained in the department's

current practices and procedures, presumably to prevent a reoccurrence of the previous problems. The noncriminal misconduct at issue in this case did not rise to the level of "apparent and egregious misconduct on the part of the employee" that has resulted in the proper vacating of arbitral awards by courts in other cases. See *Metropolitan District Commission* v. *Local 184, Council 4, AFSCME, AFL-CIO*, 77 Conn. App. 832, 845, 825 A.2d 218 (2003). For the foregoing reasons, we conclude that the court improperly vacated the arbitration award on the ground that it violated public policy.

The judgment is reversed and the case is remanded with direction to deny the plaintiff's application to vacate the arbitration award and to grant the defendant's application to confirm the arbitration award.

In this opinion the other judges concurred.