******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRIDGEPORT BOARD OF EDUCATION
*v.* NAGE, LOCAL RI-200
(AC 36092)

Sheldon, Prescott and Pellegrino, Js.

*Argued January 5—officially released October 13, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, Radcliffe, J.)

*John P. Bohannon, Jr.*, for the appellant (plaintiff).

*Thomas W. Bucci*, for the appellee (defendant).

*Opinion*

PELLEGRINO, J. The plaintiff, Bridgeport Board of Education (board),[1] appeals from the decision of the trial court denying its application to vacate an arbitration award in favor of the defendant, NAGE, Local RI-200 (union). On appeal, the board claims that the court should have vacated the award because (1) it failed to conform to the submission, (2) the arbitrators exceeded their authority and issued an award that is not mutual, final and definite, and (3) the award violates public policy. Because we conclude that the award violates public policy, we reverse the judgment of the trial court. In light of this conclusion, we need not address the board's additional claims.

The following facts, as found by the arbitration panel and recited by the trial court, are relevant to this appeal. On June 25, 2011, Adam Cleveland, a custodian employed by the board and assigned to the Bridgeport public schools, mailed a packet of handwritten and printed materials to Lawrence Osborne, the director of labor relations for the city of Bridgeport (city). Copies of the packet were also mailed to the city's mayor, the Bridgeport Police Department and the union. In the packet, Cleveland identified himself as a custodian and claimed to be the victim of harassment by Jorge Garcia, an operations supervisor for the board. Specifically, Cleveland alleged that Garcia had made untrue statements about him, singled him out for special treatment, and accused him of making a threatening telephone call to a female supervisor, a charge that was not proven and disavowed by the supervisor in question. The packet clearly indicated that it was coming from Cleveland and included a note that requested a meeting to discuss the situation, as well as copies of various e-mails and definitions of legal terms. The printed material also included detailed descriptions from the internet of the mass shooting incidents at Columbine High School in 1999 and Virginia Polytechnic Institute and State University (Virginia Tech) in 2007. The handwritten material concluded with the statement that "[i]f Jorge Garcia can't control the statements he can't control the out come. If I'm being punished for breaking rules then we all should."

After receiving these materials on June 28, 2011, Osborne contacted the Bridgeport Police Department. Cleveland was thereafter arrested and charged with threatening in the second degree and harassment in the second degree. That same day, the board suspended Cleveland with pay. On December 23, 2011, following an investigation, the board terminated Cleveland's employment. The letter terminating Cleveland's employment stated that his conduct in sending the packet had been in violation of the city's prohibition on the following forms of inappropriate behavior: "[p]hysical violence, fighting or promoting a fight on

City property . . . [b]ehavior that disrupts the work environment [including] indecent, inappropriate or immoral conduct . . . [and] [f]oul or abusive language directed at co-workers, visitors, clients or taxpayers."[2] The letter further stated that Cleveland's conduct had violated the city's prohibition against unprofessionalism, and unethical or illegal actions, and, furthermore, that such conduct was considered a " 'grave offense' " under the collective bargaining agreement between the union and the city.[3]

The union filed a grievance on Cleveland's behalf, claiming that the termination was in violation of the collective bargaining agreement between the union and the city. The case proceeded to arbitration before the state board of mediation and arbitration. By agreement of the parties, the issue submitted to the arbitration panel was unrestricted; it asked: "Did the City of Bridgeport have just cause to terminate Adam Cleveland pursuant to the Collective Bargaining Agreement? If not, what shall the remedy be?"

On January 9, 2013, the panel of arbitrators, after considering all of the evidence submitted at a three day hearing, issued its award. After noting that Cleveland had prior disciplinary issues, the panel stated that "[t]he incident that led to his dismissal was a *serious offense* and the people mentioned in the packet of letters had reason to be *alarmed and fearful of their lives*.[4] Under normal circumstances, the City would be justified in terminating Mr. Cleveland's employment. The panel of arbitrators, however, believes that Mr. Cleveland's actions were a 'cry for help.' He was completely frustrated with the situation that led to his dismissal. He felt that he was being singled out and harassed by Jorge Garcia and there was nobody available to help him in his plight. The claimed threatening phone call to a female supervisor was not proven. In fact, such claim was deemed inappropriate by those directly involved." (Emphasis added; footnote added.)

The panel then issued the following unanimous award: "The discharge of the grievant, Adam Cleveland, was not for just cause. Mr. Cleveland shall be afforded the opportunity to submit to the Employee Assistance Program (EAP), provided in the Collective Bargaining Agreement. If he takes advantage of, successfully completes the EAP, and is deemed able to be re-employed by the medical professionals involved, the discharge will be converted to a suspension without pay. If Mr. Cleveland refuses the offer to submit to the EAP within ten (10) days of receipt of this Award or fails to complete the program or abide by the recommendations of the EAP, the discharge will be upheld."

On January 15, 2013, the board filed an application to vacate the arbitration award in the Superior Court, contending that the award was in violation of this state's clearly defined and dominant public policies against

violence in public schools and workplace violence. The board further claimed that the award did not conform to the submission and that it should be vacated pursuant to General Statutes § 52-418 (a). On April 15, 2013, the board filed a memorandum of law, in which it argued that the award was in contravention of explicit, well-defined and dominant public policies prohibiting workplace violence, harassment and threatening, and promoting school safety. The board also argued that the panel exceeded its powers in manifest disregard of the law. The union opposed the board's application to vacate, arguing that, although there are well established public policies against workplace violence, threats and harassment, and in support of school safety, the award did not violate any of those policies. The union further argued that the panel had not exceeded its powers in manifest disregard of the law.

Following a hearing, the court denied the board's application to vacate. In its memorandum of decision, the court considered whether enforcement of the arbitration award would violate public policy. It recognized that simply because there was a clear and dominant public policy against workplace violence did not mandate that, in every instance of threatening conduct, an employee must be terminated immediately without regard to the facts and circumstances of the particular case. The court found that the arbitration panel had issued a "thoughtful, well-reasoned decision, based upon a weighing of the evidence presented, during the course of a three day hearing," and that this decision was not in violation of the public policy concerning workplace violence. The board then filed the present appeal, arguing, inter alia, that the award violates well established public policies prohibiting workplace violence, threatening and harassment, and promoting a safe school setting in our public schools.

Before addressing the board's claims, we first set forth the legal principles regarding judicial review of arbitral awards. "Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." (Internal quotation marks omitted.) *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 298 Conn. 824, 834, 6 A.3d 1142 (2010).

"The long-standing principles governing consensual arbitration are, however, subject to certain exceptions. Although we have traditionally afforded considerable deference to the decisions of arbitrators, we have also conducted a more searching review of arbitral awards in certain circumstances. In *Garrity* v. *McCaskey*, [223 Conn. 1, 6, 612 A.2d 742 (1992)], this court listed three recognized grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . or (3) the award contravenes one or more of the statutory proscriptions of § 52-418 (a). . . . The judicial recognition of these grounds for vacatur evinces a willingness, in limited circumstances, to employ a heightened standard of judicial review of arbitral conclusions, despite the traditional high level of deference afforded to arbitrators' decisions when made in accordance with their authority pursuant to an unrestricted submission." (Internal quotation marks omitted.) *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, supra, 298 Conn. 835.

"[W]hen a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy. . . . To determine whether an arbitration award must be vacated for violating public policy, we employ a two-pronged analysis. . . . First, we must determine whether the award implicates any explicit, well-defined, and dominant public policy. . . . To identify the existence of a public policy, we look to statutes, regulations, administrative decisions, and case law. . . . Second, if the decision of the arbitrator does implicate a clearly defined public policy, we then determine whether the contract, as construed by the arbitration award, violates that policy." (Citations omitted; internal quotation marks omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 630–31, 114 A.3d 144 (2015) (*Burr Road*).

With regard to the first prong, the union does not dispute the existence of well-established public policies prohibiting workplace violence, threatening and harassment, and promoting safe settings for Connecticut public schools. As the existence of these policies is not in dispute, we proceed to consider whether the arbitration award in this case violated any of those policies. In making this determination, we are "mindful that the fact that an employee's misconduct implicates public policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct. . . . Rather, a party seeking to vacate an arbitration award reinstating a terminated employee bears the burden of proving that illegality or conflict with public

policy is clearly demonstrated . . . and that nothing less than the termination of [the grievant's] employment will suffice to vindicate the public policy at issue." (Citations omitted; internal quotation marks omitted.) Id., 631.

Our Supreme Court recently "clarif[ied] the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy, and, by extension, the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge. Specifically, in determining whether termination of employment was necessary to vindicate the public policies at issue, both the majority and dissenting opinions of [our Supreme] [C]ourt have, either expressly or implicitly, focused on four principal factors: (1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." Id., 633–34.[5] The arbitration panel in the present case did not unconditionally reinstate Cleveland to his employment as a custodian; it did, however, conclude that termination of Cleveland's employment was not for good cause. Accordingly, we analyze this case pursuant to the factors set forth in *Burr Road* and conclude that that the board has satisfied its burden of establishing that the award violates the public policy of this state and, therefore, the trial court improperly denied the application to vacate the award.

I

"The first factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review." (Citations omitted.) Id., 634–35.

In determining whether the public policies at issue required Cleveland's immediate termination from employment, we first note that threatening violence against another person is a crime punishable by up to one year in prison. See General Statutes § 53a-62.[6] Cleveland's conduct in this case resulted in his arrest for threatening in the second degree and harassment in the second degree. We next note, with regard to school safety, that the board is required, pursuant to General Statutes § 10-220 (a) (4), to provide "an appro-

priate learning environment for its students which includes . . . a safe school setting . . . ."

With respect to the workplace, Executive Order No. 16, "Violence in the Workplace Prevention Policy" (August 4, 1999) (executive order),[7] expressly adopts and sets forth a statewide "zero tolerance" policy prohibiting state employees from committing or threatening to commit violent acts in the workplace.[8] See *State v. Connecticut State Employees Assn., SEIU Local 2001*, 287 Conn. 258, 276, 947 A.2d 928 (2008) ("the public policy against workplace violence is clearly defined and dominant"). The executive order explicitly recognized that workplace violence is a growing problem and that the state is committed to providing its employees with a reasonably safe and healthy working environment, free from intimidation, harassment, threats and violent acts. It states that "violence or the threat of violence by or against any employee of the [s]tate of Connecticut or member of the public in the workplace is unacceptable and will subject the perpetrator to serious disciplinary action up to and including discharge and criminal penalties." The executive order, therefore, contemplates that some instances of misconduct violative of the policy will be so egregious that termination is the only appropriate sanction.[9] We conclude that this is such a case.

The packet that Cleveland mailed to city and board officials included printed material with detailed references to the 1999 shooting at Columbine High School in Colorado, where two gunmen killed twelve students and one teacher, and to the 2007 Virginia Tech massacre, where a student with mental illness killed thirty-two students and faculty, wounding many others. In addition to the descriptions of the shootings at Columbine High School and Virginia Tech, the printed material in the packet included legal definitions of "terroristic threat" and "wanton endangerment." In one of the handwritten pages, entitled "The Threat to the Mayor," Cleveland referenced a picnic attended by other board employees and stated: "[Twenty] feet from them you were standing while looking at them. I walk[ed] to you and shook your hand and you don't even know what I look like! But they got up and left." The last page of the mailing included the following handwritten statement: "If Jorge Garcia can't control the statements he can't control the out come. If I'm being punished for breaking rules we all should." After Cleveland was arrested for mailing this packet, an incident report states that he indicated to police that "the information included in the packet with regards to Columbine and Virginia Tech was included as an example of what could happen if Jorge [Garcia] would continue threatening people."[10] The board reasonably understood Cleveland to have threatened to murder students and coworkers in the school system if he did not have his demands met.

As stated previously, in considering whether public policy recommends or requires the immediate termination of Cleveland's employment, "we ask whether the offense committed by [Cleveland] involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199,* supra, 316 Conn. 634–35. The answer to this question weighs heavily in favor of vacating the arbitration award. The arbitration panel stated that the people mentioned in the packet of letters had reason to be alarmed and in fear of their lives. There would be substantial liability for an employer if it failed to eradicate this threat. Also critical is the fact, as we have previously noted, that the threats were directed not only to the recipients of the packet but to many others—innocent persons, like the victims of the Columbine High School and Virginia Tech shootings. In this day and age, such threats are intolerable, however subtly or indirectly they are phrased or presented. In light of the public policies outlined earlier, and considering that the material included in the packet was such that the recipients had reason to fear for their lives, and the entire community had reason to consider itself in danger, it is clear that Cleveland's conduct is the type of conduct that the law deems to be inexpiable.

## II

"The second factor we consider is whether the nature of the employment at issue implicates public safety or the public trust. . . . Nationally, in the vast majority of cases in which courts have vacated for public policy reasons arbitration awards reinstating terminated employees, the grievant has been a public sector employee, primarily working in fields such as law enforcement, education, transportation, and health care, in other words, fields that cater to vulnerable populations or help ensure the public safety. . . . This reflects the fact that the threat to public policy involved in reinstating a terminated employee is magnified when the offending employee provides an essential public service, and especially when he is employed by, represents, and, ultimately, is answerable to the people." (Citations omitted.) Id., 635–36. "This factor also hinges on general questions of law and policy and is, therefore, subject to plenary judicial review." Id., 637.

In the present case, the union contends that Cleveland's position as a custodian with the board does not implicate the public safety or public trust. We disagree. It is undisputed that Cleveland's employment with the board is in the public sector. It is also clear that the board is required to provide a safe school setting; General Statutes § 10-220 (a) (4); and that parents are required to send their children to school. General Statutes § 10-184.[11] Furthermore, "schools have a duty to

protect students from imminent harm." *Haynes* v. *Middletown*, 314 Conn. 303, 314–15 n. 6, 101 A.3d 249 (2014) (discussing imminent harm to identifiable persons exception to defense of governmental immunity). Cleveland's employment with the Bridgeport public school system, which is in the public sector, and where attendance by the students is required, is a position that "cater[s] to vulnerable populations . . . ." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 635. His employment implicates the public safety or public trust. Cleveland's mailing, which implicitly threatened the mass murder of students and coworkers employed by the board as well as the mayor, jeopardized the public safety and public trust. For this reason, we conclude that this factor weighs in favor of vacating the arbitration award.

### III

"The third factor we consider is the relative 'egregiousness' of the grievant's offense. . . . This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. . . .

"This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. . . . We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue. . . . [F]or purposes of the public policy analysis [however], our determination of whether the conduct in question was so egregious that any punishment short of termination would offend public policy is not restricted to those findings. . . . A broader review is required because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on case specific considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and

the public at large, who may be adversely impacted by the decision to reinstate the employee. . . . Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted.) Id., 637–39.

In its decision in this case, the arbitration panel set forth the history of animosity between Cleveland and his supervisor, Garcia, prior to Cleveland mailing the packet of letters, and described how the situation escalated when Cleveland mailed the packet.[12] The panel noted that Cleveland had been disciplined for a past incident and that progressive discipline had been applied to him. It then stated: "The incident that led to his dismissal was a serious offense and the people mentioned in the packet of letters had reason to be alarmed and fearful of their lives. Under normal circumstances, the city would be justified in terminating Mr. Cleveland's employment. The panel of arbitrators, however, believes that Mr. Cleveland's actions were a 'cry for help.' He was completely frustrated with the situation that led to his dismissal. He felt that he was being singled out and harassed by Jorge Garcia and there was nobody available to help him in his plight. The claimed threatening phone call to a female supervisor was not proven. In fact, such claim was deemed inappropriate by those directly involved."

Pursuant to *Burr Road*, we defer to the arbitration panel's factual findings, as stated previously, but review de novo the question whether the remedy was sufficient to vindicate the public policies at issue. In making this determination, we again emphasize the panel's finding that "[t]he incident that led to [Cleveland's] dismissal was a serious offense and the people mentioned in the packet of letters had reason to be alarmed and fearful of their lives." The fact that the panel required Cleveland to submit to the employee assistance program, and further, that he be deemed fir for work by medical professionals prior to reinstatement, shows that it viewed Cleveland's conduct as threatening and serious. The severity of the harm imposed and the risk created by Cleveland's conduct was great; he made his intent known when he informed the police, upon arrest, that the information regarding Columbine High School and Virginia Tech was included in the packet as an example of what could happen if Garcia continued to threaten people. Threats of a mass atrocity against students and educators falls at the very core of the public policies prohibiting workplace violence, threatening and harassment, and promoting a safe school setting for Connecticut public schools.

The arbitration panel stated that "[u]nder normal circumstances," the board would be justified in terminating Cleveland's employment; in this case, however, it found that termination was not justified because Cleve-

land's actions were a " 'cry for help.' " We conclude, to the contrary, that even if Cleveland's actions were a cry for help, the award would still be in violation of the various public policies specified earlier in this opinion. In *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 469, 471, 478, 747 A.2d 480 (2000), our Supreme Court upheld the judgment of the trial court vacating an arbitration award that ordered reinstatement of a correction officer who had made an anonymous, obscene and racist telephone call to a public official from a state owned telephone. The arbitrator in that case had justified reinstating the correction officer because his conduct was "the outgrowth of various personal stressors." (Internal quotation marks omitted.) Id., 477. The Supreme Court "agree[d] with the trial court that, in doing so, the arbitrator minimize[d] society's overriding interest in preventing conduct such as that at issue in this case from occurring. Thus, the award—with its inherent rationalization of conduct stipulated to by [the correction officer], which was violative of statute and regulations—is in itself violative of clear public policy. As the trial court aptly stated, the termination of [the correction officer] as provided for in the department of correction regulations is warranted . . . . A lesser sanction—a progressive sanction, as suggested by the arbitrator—would, very simply, send the message that stress, or poor judgment, or other factors, somehow renders the conduct permissible or excusable." (Internal quotation marks omitted.) Id.

Similarly, we conclude that Cleveland's termination from employment was warranted in the present case. A lesser sanction would send an unacceptable message to the public and other employees that a threat by an employee to commit random shootings in an educational setting is permissible or excusable. We recognize that referral to the employee assistance program is consistent with article 33 of the parties' collective bargaining agreement. That section provides in relevant part that "[t]he [c]ity . . . recognizes that almost any human problem can be successfully treated provided it is identified in its early stages, and referral is made to an appropriate modality of care. This applies whether the problem be one of physical illness, mental or emotional illness, finances, marital or family distress, alcoholism, drug abuse or legal problems." This consideration, however, does not outweigh the strong public policies at issue in the present case. For this reason, we conclude that this factor weighs in favor of vacating the arbitration award.

IV

"The fourth factor we consider is whether the grievant is so 'incorrigible' as to require termination. . . . Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court

uphold the arbitration award of reinstatement, this particular employee will reengage in the offending conduct? . . . Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from additional training and guidance. . . . We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. . . .

"Because these considerations are largely fact based and case specific, a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . Absent an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Citations omitted.) *Burr Road Operating Co. II*, *LLC* v. *New England Health Care Employees Union*, *District 1199*, supra, 316 Conn. 639–40.

In the present case, the arbitration panel noted that Cleveland had been subject to discipline in the past, including a suspension, and that progressive discipline had been applied to him, but it did not find that Cleveland was likely to reengage in the offending conduct. A review of Cleveland's employment file, however, makes it clear that, although Cleveland had been subject to prior discipline, he had not demonstrated a willingness to change his behavior, nor had he indicated remorse for past offenses.[13] The file also reveals that Cleveland's erratic behavior was a concern to his coworkers in the school system. By memorandum dated August 10, 2009, David Sharpe, an employee of the Curiale School in Bridgeport, reported an incident in which Cleveland had acted in a threatening manner.[14] The same day, Delmar Twistol, an operations supervisor for the board, e-mailed several individuals and stated: "In light of [Cleveland's] past confrontations with Jorge Garcia and his increasingly erratic and paranoiac behavior, Jorge and myself believe [Cleveland] needs to be psychiatrically evaluated a.s.a.p. His co-workers are wary and often frightened of his behavior. His supervisors are hesitant of giving him orders in fear of setting him off. He is now making statements of putting this 'to an end.' We are wary for the safety of all concerned." In December, 2008, Cleveland was suspended with pay for ten working days as a result of an incident involving Cleveland and Garcia. Finally, as noted by the arbitration panel, Cleveland had a prior suspension for leaving

work prior to the conclusion of his shift.

In light of Cleveland's erratic and threatening behavior, as evidenced in his employment file, we conclude that the likelihood of recidivism was substantial if he was not terminated from employment. As the packet of materials that precipitated this incident contained clear references to the Columbine High School and Virginia Tech school massacres, and the arbitration panel concluded that the recipients of the packet "had reason to be alarmed and fearful of their lives," we further conclude that the discipline imposed by the arbitration panel was not severe enough to deter future infractions. Accordingly, this factor weighs in favor of vacating the arbitration award.

In sum, because each of the *Burr Road* factors weighs in favor of vacating the award, we conclude that it is necessary to reverse the judgment of the court denying the board's application to vacate the award. In doing so, we emphasize the trust parents place in our school systems and educators that their children will attend schools that are safe and devoid of threats and violence, thereby freeing children to learn and grow. Because Cleveland's conduct gravely undermines this trust, an award permitting him to continue to work among the children of the Bridgeport public school system simply cannot stand.

The judgment is reversed and the case is remanded with direction to render judgment granting the board's application to vacate the arbitration award.

In this opinion the other judges concurred.

[1] The record reflects that on March 4, 2013, the board filed a motion to substitute the city of Bridgeport as the plaintiff in place of the board. The court granted this motion on March 19, 2013. The court's memorandum of decision, however, refers to the plaintiff as the board. Additionally, the appellant's brief refers to the plaintiff as the board. For purposes of this opinion, therefore, we refer to the plaintiff as the board.

[2] The city "Work Rules and Regulations" provide in relevant part as follows: "There are certain standards of behavior which we must all observe as good citizens and good employees. All employees are expected to perform their jobs with pride and respect for our City, and with consideration for their associates.

"Violation of City rules and disciplinary steps are oral warning, written warning, suspension and discharge. Your supervisor will discuss our disciplinary steps in detail with you. Generally, no conduct which is unprofessional, unethical or illegal will be tolerated. It is impossible to list all the circumstances which warrant discipline. In our opinion, the following are some of those circumstances. We consider the following to be unacceptable and inappropriate behavior and intend to take actions up to and including immediate termination, when appropriate and consistent with any existing collective bargaining agreement. . . .

"5. Physical violence, fighting or promoting a fight on city property. . . .

"9. Behavior that disrupts the work environment to include indecent, inappropriate, or immoral conduct. . . .

"14. Foul or abusive language directed at co-workers, visitors, clients or taxpayers."

[3] Section 15.3 of the parties' collective bargaining agreement provides: "Disciplinary action shall include (a) a verbal warning, (b) a written warning, (c) suspension without pay, and (d) discharge. The City and the Union recognize the concept of a progressive discipline policy, however both parties agree that there are certain grave offenses wherein the discipline imposed by the City does not require compliance to the aforementioned

provisions." The collective bargaining agreement does not define what constitutes a "grave offense" for purposes of this section.

[4] We note that the arbitration panel referred to the incident in question as a "serious offense" while the letter terminating Cleveland's employment indicated that his conduct was considered a " 'grave offense' " as set forth in the collective bargaining agreement. See footnote 3 of this opinion.

[5] *Burr Road* was released on May 5, 2015. On May 7, 2015, this court ordered the parties to file simultaneous supplemental briefs addressing the applicability of *Burr Road* to the present case.

[6] General Statutes § 53a-62, entitled "Threatening in the second degree," provides: "(a) A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) such person threatens to commit any crime of violence with the intent to terrorize another person, or (3) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror.

"(b) Threatening in the second degree is a class A misdemeanor."

[7] Executive Order No. 16 provides in relevant part: "WHEREAS, the [s]tate of Connecticut recognizes that workplace violence is a growing problem that must be addressed; and

"WHEREAS, the [s]tate is committed to providing its employees a reasonably safe and healthy working environment, free from intimidation, harassment, threats, and/or violent acts; and

"WHEREAS, violence or the threat of violence by or against any employee of the [s]tate of Connecticut or member of the public in the workplace is unacceptable and will subject the perpetrator to serious disciplinary action up to and including discharge and criminal penalties.

"NOW, THEREFORE, I, John G. Rowland, [g]overnor of the [s]tate of Connecticut, acting by virtue of the authority vested in me by the [c]onstitution and by the statutes of this state, do hereby ORDER and DIRECT:

"1. That all state agency personnel, contractors, subcontractors, and vendors comply with the following Violence in the Workplace Prevention Policy:

"The [s]tate of Connecticut adopts a statewide zero tolerance policy for workplace violence.

"Therefore, except as may be required as a condition of employment—

• No employee shall bring into any state worksite any weapon or dangerous instrument as defined herein.

• No employee shall use, attempt to use, or threaten to use any such weapon or dangerous instrument in a state worksite.

• No employee shall cause or threaten to cause death or physical injury to any individual in a state worksite. . . .

"3. That all managers and supervisors are expected to enforce this policy fairly and uniformly.

"4. That any employee who feels subjected to or witnesses violent, threatening, harassing, or intimidating behavior in the workplace immediately report the incident or statement to their supervisor, manager, or human resources office.

"5. That any employee who believes that there is a serious threat to their safety or the safety of others that requires immediate attention notify proper law enforcement authorities and his or her manager or supervisor.

"6. That any manager or supervisor receiving such a report shall immediately contact their human resources office to evaluate, investigate and take appropriate action.

"7. That all parties must cooperate fully when questioned regarding violations of this policy.

"8. That all parties be advised that any weapon or dangerous instrument at the worksite will be confiscated and that there is no reasonable expectation of privacy with respect to such items in the workplace.

"9. That this order applies to all state employees in the executive branch.

"10. That each agency will monitor the effective implementation of this policy.

"11. That this order shall take effect immediately."

[8] The executive order arose from a 1998 workplace incident in which "a disgruntled employee, returning to work after a leave to treat stress, went on a shooting rampage at the Connecticut Lottery Office and killed four people and then himself." Office of Legislative Research, Research Report No. 2008-R-0623, "Bullying and the State Zero Tolerance Policy for Workplace Violence" (November 14, 2008), available at http://www.cga.ct.gov/2008/rpt/2008-R-0623.htm (last visited October 2, 2015).

[9] We recognize, as we must, that in some instances the employee's conduct will not be so egregious that termination is required, and that the policies cited herein do not require termination in every instance. Threatening to commit a mass atrocity in the manner of Columbine High School or Virginia

Tech, where many students and faculty lost their lives, is, in our view, so serious that nothing less than termination is necessary to vindicate these dominant public policies.

[10] The arraignment report and affidavit regarding this incident states, in part: "Upon talking with Cleveland [he] states that he sent a manila envelope containing a handwritten letter, along with several other emails to several offices in City Hall; one addressed to Larry Osborne, his union, and civil service. Cleveland state[d] he [had] been having an on-going problem with the city regarding an incident that took place back in 2008. Shortly after we advised Cleveland that he was under arrest for threatening and was handcuffed and placed in the back of the patrol car, Cleveland was transported to booking. While in the vehicle . . . the suspect made a spontaneous utterance to [one] [o]fficer . . . that the information included in the packet with regards to Columbine and Virginia Tech was included as an example of what could happen if his boss Jorge [Garcia] would continue threatening people. Due to the fact, according to [Cleveland], that his boss Jorge had someone call and threaten a police officer's wife."

[11] General Statutes § 10-184, entitled "Duties of parents. School attendance age requirements," provides in relevant part: "[E]ach parent or other person having control of a child five years of age and over and under eighteen years of age shall cause such child to attend a public school regularly during the hours and terms the public school in the district in which such child resides is in session, unless such child is a high school graduate or the parent or person having control of such child is able to show that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools."

[12] The panel found as follows: "The grievant, Adam Cleveland, had been a custodian in the Bridgeport Public Schools since February 18, 2007. He had been transferred a few times and, thus, worked under several supervisors. One of his supervisors was Jorge Garcia. Cleveland and Garcia had issues with each other emanating from an incident outside of work when they ran into each other in front of a barber shop when Garcia was with his son.

"Cleveland was suspended previously [when he and] other employees . . . were caught leaving a school earlier than their shift terminated. Thereafter, he seemed to have a running issue with Garcia, who became director of operations and facilities in charge of the maintenance in several school buildings. According to Cleveland, Garcia was attempting to accuse Cleveland of making a threatening phone call to a female supervisor who Cleveland was scheduled to work under. Several employees, including the female supervisor, testified that Garcia's actions were inappropriate when he tried to connect Cleveland to the phone call.

"All the issues came to a head when Larry Osborne, the director of labor relations, received a package on June 28, 2011, of handwritten letters with various computer printouts relating to definitions of legal terms, various incidents involving [Cleveland] and Jorge Garcia and computer pages that contained information about the Columbine High School massacre and the Virginia Tech massacre. The letter was very random when it related to incidents that [Cleveland] had encountered with Garcia and indicated that [Cleveland] felt he was being harassed by Garcia. The letter clearly identified that it came from [Cleveland] who asked to have a meeting with Mr. Osborne so that he could explain the problems he was encountering. The letter was also referred to the mayor and other city employees."

[13] A portion of Cleveland's employment file was attached as an exhibit to the board's memorandum of law in support of its application to vacate the arbitration award.

[14] The memorandum stated as follows: "This morning around 6:45 a.m. I was working on our progress sheet when Adam Cleveland came in. I said good morning to him and he walked right by me then turned around and had a tape recorder in his hand. He said to me [he] was tired of this fucking shit and he said that I could tell Jorge that he was going to put this to bed once and for all. He started to play the tape but I couldn't understand it. He started ranting and raving about me, Jorge [Garcia], Delmar [Twistol] and Curtis [Hooks] about putting this to bed once and for all. At this point he was gritting his teeth, his eyes were bulging out and he was babbling on about they'll see and I should call them and tell them.

"He did not look like himself when he was leaving and said I'll take my days when I get good dam and ready. I do not know what he meant by this. I feel like he is a threat to me as well as others by the way he looked and acted."